**ALLIANCE FOR CLEAN COAL, Plaintiff,**

v.

**The Honorable Evan BAYH, et al., Defendants.**

**International Union, United Mine Workers of America, and PSI Energy, Inc., Intervenor Defendants.**

**No. IP94–0890–C–T/G.**

United States District Court, S.D. Indiana, Indianapolis Division.

March 27, 1995.

Robert W. Geddes, Hume Smith Geddes & Green, Indianapolis, IN, R.R. McMahan, Lord Bissell & Brook, Chicago, IL, for plaintiff.

Virgil Beeler, Baker & Daniels, Peggy A. Hillman, Indiana Civil Liberties Union, Indianapolis, IN, Edgar N. James, Guerrieri Edmond & James, Washington, DC, G. Daniel Kelley Jr., Ice Miller Donadio & Ryan, Myra P. Spicker, Deputy Atty. Gen., Edward P. Steegmann, Ice Miller Donadio & Ryan, Indianapolis, IN, for defendants.

**Memorandum Entry Regarding Defendants' Motion to Dismiss, Defendants' Motion to Abstain and the Parties' Cross–Motions for Summary Judgment**

TINDER, District Judge.

This matter comes before the court on multiple motions. First, Defendants move to dismiss Plaintiff's case for lack of jurisdiction over the subject matter under Rule 12(b)(1) of the Federal Rules of Civil Procedure. Second, Defendants move the court to abstain from proceeding further in this case under the doctrine set forth in *Burford v. Sun Oil Co.*, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943), or the doctrine stated in *Colorado River Water Conservation District v. United States*, 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976). Finally, the parties filed cross-motions for summary judgment under Federal Rule of Civil Procedure 56. The court, having considered the motions and the submission of the parties, finds that Defendants' motions to dismiss for lack of subject matter jurisdiction should be **DENIED;** that Defendants' motion for the court to abstain from proceeding further in this case should be **DENIED;** and that Plaintiff's motion for summary judgment should be **GRANTED** and Defendants' cross-motion for summary judgment should be **DENIED.**

## I. Factual Background and Procedural History

Coal is produced in over half the states and is sold in a highly competitive interstate market. Most of the coal produced is used by electric utilities, accounting, for example, for 56 percent of all electricity generated in 1992. Nevertheless, all coal is not alike. Coal mined in the western states ("western coal") generally has a lower sulfur content than coal mined in the central and eastern portions of the United States. Most coal mined in Indiana has a relatively high sulfur content. When coal is burned, sulfur dioxide ("$SO_2$") is emitted in direct proportion to its sulfur content. In light of increasing air pollution problems, reducing $SO_2$ emissions has become a national priority. One way for coal-burning facilities to reduce $SO_2$ emissions is simply to burn lower sulfur coal. *See*

*generally* BRUCE A. ACKERMAN & WILLIAM T. HASSLER, CLEAN COAL/DIRTY AIR (1981).

In 1970, Congress responded to the problem of atmospheric emissions by amending the Clean Air Act ("1970 CAAA"), authorizing the United States Environmental Protection Agency ("EPA") to set new source performance standards to regulate various emissions, including $SO_2$. 42 U.S.C. § 7411 (1970). In promulgating emissions standards for new sources, the EPA approved two methods for controlling $SO_2$ emissions: (1) the use of low sulfur coal; and (2) the use of pollution control devices ("scrubbers") to reduce emissions before they could reach the atmosphere.

In 1977, Congress again amended the Clean Air Act ("1977 CAAA") by requiring new or modified sources to use the "best technological system ... adequately demonstrated" to reduce $SO_2$ emissions. 42 U.S.C. § 7411(a)(1) (1977). Under the 1977 CAAA, the EPA set standards requiring percentage decreases of $SO_2$ emissions. *See Sierra Club v. Costle*, 657 F.2d 298, 312 (D.C.Cir.1981) (upholding the EPA's promulgation of percentage reduction standards under the 1977 CAAA). Whereas under the 1970 CAAA, coal-burning electric plants could choose the most cost-effective means of compliance, under the 1977 CAAA, new facilities effectively were required to build scrubbers regardless of the sulfur content of the coal they burned and regardless of the cost.

In 1990, Congress once again amended the Clean Air Act ("1990 CAAA"), adding an acid rain reduction program which mandates drastic reductions in industrial $SO_2$ emissions. 42 U.S.C. §§ 7651 to 7661f (1990). Under Phase I of the 1990 CAAA, the 110 largest coal-burning facilities in 21 states must meet an intermediate $SO_2$ emissions limit by 1995. 42 U.S.C. § 7651c. Under Phase II of the 1990 CAAA, all facilities will be required to meet more stringent emissions limitations starting in 2000. 42 U.S.C. § 7651d. Under the 1990 CAAA, coal burning electric plants are again free to comply with $SO_2$ emissions standards by the most cost-effective means. The principle methods presently available for complying with the Phase II limitations are installing new scrub-

bers, using lower sulfur coal, switching to another fuel source (e.g., natural gas), or buying or offsetting emissions from other plants.[1]

In 1991, Indiana adopted the Environmental Compliance Plans Act ("ECPA") with an eye toward facilitating implementation by Indiana utilities of the changes dictated by the 1990 CAAA. IND.CODE ANN. §§ 8–1–27–1 to 8–1–27–23 (Burns 1991 and Supp.1994).[2] The ECPA essentially allows a utility to seek an early prudency review of its compliance decisions by the Indiana Utility Regulatory Commission ("IURC"),[3] by submitting for review its chosen method of compliance. Following the prudency review, the utility is able to include the capital costs of facilities in its rate base and to recover the costs of development and implementation. IND.CODE ANN. §§ 8–1–27–12 & 19 (Burns 1991). Failure by a utility to avail itself of the early prudency review provided by the ECPA requires that the utility wait until after it has embarked upon a course of action designed to comply with the 1990 CAAA before it may go to the IURC and seek a rate adjustment. Such adjustment will be awarded so long as the IURC finds that the compliance method chosen by the utility was the most cost-effective method available. Obviously, seeking a post-compliance rate increase carries considerably more risk than pre-approval under the ECPA because the utility runs the risk that the IURC will not approve its chosen 1990 CAAA compliance methods as most cost-effective, leaving the utility unable to fully recover expenditures already made.

On June 3, 1994, Plaintiff Alliance for Clean Coal ("Alliance") filed the instant suit challenging the constitutionality of portions of the ECPA. Defendants have filed motions challenging Plaintiff's standing and requesting that the court abstain from further proceeding in this case. On July 15, 1994, Plain-

tiff filed a motion for summary judgment which is fully briefed. On November 1, 1994, Intervenor Defendant PSI Energy, Inc. ("PSI") filed a cross-motion for summary judgment. With this procedural framework in mind, the court shall address each of the parties' motions in turn.

## II. Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction

Defendants PSI and the State move to dismiss Plaintiff's suit on the grounds that this court does not have subject matter jurisdiction over Plaintiff's claims. Essentially, Defendants argue that Plaintiff does not have standing to challenge the constitutionality of the Indiana Coal Act.

Federal courts are courts of limited jurisdiction and are empowered to hear only those cases that are within the judicial power of the United States, as defined in the United States Constitution, or that have been entrusted to them by a jurisdictional grant by Congress. *See, e.g., Kokkonen v. Guardian Life Ins. Co. of Am.,* —— U.S. ——, ——, 114 S.Ct. 1673, 1675, 128 L.Ed.2d 391 (1994). The United States Supreme Court stated the standard exposition of the rule as follows:

> The jurisdiction of the federal courts is carefully guarded against expansion by judicial interpretation or by prior action or consent of the parties. To permit a federal trial court to enter a judgment ... where the federal court could not have original jurisdiction ... would by the act of the parties work a wrongful extension of federal jurisdiction and give district courts power the Congress has denied them.

*American Fire & Casualty Co. v. Finn,* 341 U.S. 6, 17–18, 71 S.Ct. 534, 542, 95 L.Ed. 702 (1951) (superseded by statute on other grounds) (footnote omitted).

---

**1.** The 1990 CAAA implements a market-driven approach to environmental regulation. The EPA provides utilities emission allowances permitting them to emit a specified amount of $SO_2$. The utility may use its allowances or it may "over-comply" and sell unused allowances under a free market system. *See* James E. Krier, *Marketable Pollution Allowances,* 25 U.TOL.L.REV. 449 (1994); Brennan Van Dyke, Note, *Emissions Trading to*

*Reduce Acid Deposition,* 100 YALE L.J. 2707 (1991).

**2.** The full text of the Act as set forth in the Indiana Code is provided at Appendix A.

**3.** The 1990 CAAA specifically reserved to the states the power to conduct prudency reviews. 42 U.S.C. § 7651b(f).

It is a well-settled rule that the party seeking to invoke the jurisdiction of a federal court must demonstrate that their case is within the competence of that court. It is presumed that a federal court lacks jurisdiction until it has been demonstrated that jurisdiction over the subject matter exists. *See Oliver v. Trunkline Gas Co.*, 789 F.2d 341 (5th Cir.), *reh'g denied*, 796 F.2d 86 (1986); *City of Valparaiso v. Iron Workers Local Union No. 395*, 669 F.Supp. 912 (N.D.Ind. 1987). *See generally* 13 CHARLES A. WRIGHT, ET AL., FEDERAL PRACTICE & PROCEDURE § 3522 (2d ed. 1984 and Supp.1994).

■ In deciding a motion to dismiss based upon Federal Rule of Civil Procedure 12(b)(1), a court should liberally construe the complaint and is not bound to accept as true an allegation of jurisdiction where a party properly raises factual questions of subject matter jurisdiction. The court may look beyond the jurisdictional allegations to examine any evidence submitted to determine if subject matter jurisdiction in fact exists. *Roman v. United States Postal Serv.*, 821 F.2d 382, 385 (7th Cir.1987); 5A CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE § 1350 at 213–17 (1990).

The Supreme Court has concisely stated the showing a party must make to establish Article III standing:

> Over the years, our cases have established that the irreducible constitutional minimum of standing contains three elements: First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally-protected interest which is (a) concrete and particularized and (b) "actual or imminent, not 'conjectural' or 'hypothetical.'" Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be "fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court." Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992) (citations omitted).

■ The instant case is remarkably similar to the recently decided case of *Alliance for Clean Coal v. Miller*, 44 F.3d 591 (7th Cir.1995). *Miller* involved a challenge to an Illinois statute which regulated compliance with the 1990 CAAA. *Id.* at 593. The statute mandated all utilities to submit their 1990 CAAA compliance plans to the Illinois Commerce Commission for approval. *Id.* In preparing and approving the plan, the parties were required to consider the need to minimize each plan's impact on the Illinois coal industry. *Id.* The statute at issue in the case at bar is similar in many key respects to the Illinois statute at issue in *Miller*. For that reason, the court finds that the Seventh Circuit's analysis of the jurisdiction issue raised in that case is applicable here.

In *Miller*, the state also questioned Alliance's standing to challenge the statute. The Seventh Circuit found that Alliance did satisfy the requirements for standing. In so doing, the court ruled as follows:

> [T]he showing of specific "lost opportunities" is neither required to establish standing nor reasonably expected under the circumstances of this case.... The Illinois Coal Act allegedly impinges on Alliance's members' rights to compete on an equal footing in interstate commerce. This injury is particular to suppliers and others who deal or are attempting to sell western coal to Illinois utilities. Despite the absence of evidence of specific lost deals, this competitive injury is neither "conjectural" nor "hypothetical"—the injury is not a particular lost sale but the "inability to compete on an equal footing."

Moreover, because the alleged discrimination against western coal occurs at the very early stage in the utilities' drafting of compliance plans ..., it is unreasonable to expect Alliance to point to specific orders canceled or deals reneged on. Any specific supply arrangements would occur much farther down the road after a compliance plan had been adopted and approved. Plaintiff's alleged injury is that because of the challenged legislation, such plans will be less likely to include the use of western coal.

[I]t is difficult to imagine more appropriate plaintiffs to challenge the constitutionality of the Illinois Act. Sellers of out-of-state coal were the ideal plaintiffs missing in *Wyoming v. Oklahoma,* 502 U.S. 437, 462, 112 S.Ct. 789, 804, 117 L.Ed.2d 1 (1992).

*Miller,* 44 F.3d at 594–95.

The court finds that the arguments accepted by the *Miller* court are equally persuasive here. The Indiana statute is challenged on the grounds that, at some level, it imposes a bias in favor of Indiana coal. As such, the statute impacts the balance of interstate commerce to tip it in favor of in-state coal producers and against out-of-state producers.[4] This is all the injury Plaintiff need allege. Likewise, once the injury is recognized, the causal connection between that injury and the statutory provision challenged is clear. Finally, a resolution of this matter in favor of Alliance would certainly redress the injury because it will once again level the field upon which all coal producers must play. Accordingly, the court finds that Plaintiff in this case does have standing to pursue the claims at issue. Therefore, Defendants' motions to dismiss for lack of subject matter jurisdiction are hereby **DENIED.**

### III. Defendants' Motion Seeking Abstention

Defendants next move the court to abstain from taking further action in this case under either the doctrine stated in *Burford v. Sun Oil Co.,* 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943), or the doctrine stated in *Colorado River Water Conservation District v. United States,* 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976). Preliminarily, the court notes that " '[a]bstention from the exercise of federal jurisdiction is the exception, not the rule.' " *General Ry. Signal Co. v. Corcoran,* 921 F.2d 700, 708 (7th Cir.1991) (quoting *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 14, 103 S.Ct. 927, 936, 74 L.Ed.2d 765 (1983). *Accord Property & Casualty Ins. Ltd. v. Central Nat'l Ins. Co. of Omaha,* 936 F.2d 319, 321 (7th Cir.1991).

For the reasons stated below, the court finds neither of these doctrines applicable and finds that abstention would not be appropriate in the case at bar.

#### A. *Burford* Abstention

"*Burford* held that a federal court should abstain when the federal case depends on the resolution of unsettled questions of state law within the competence of an administrative agency—in *Burford* itself, an agency regulating the oil industry." *Nelson v. Murphy,* 44 F.3d 497, 501 (7th Cir.1995). "Where timely and adequate state-court review is available, a federal court sitting in equity must decline to interfere with the proceedings or orders of state administrative agencies: (1) when there are 'difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar'; or (2) where the 'exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern.' " *New Orleans Pub. Serv., Inc. v. New Orleans,* 491 U.S. 350, 361, 109 S.Ct. 2506, 2514, 105 L.Ed.2d 298 (1989) (citations omitted). "*Burford* requires abstention where a state creates a complex regulatory scheme and an exercise of federal jurisdiction would 'be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern.' Among the factors that should be considered in a *Burford* analysis are: (1) whether the suit is based on a cause of action which is exclusively federal; (2) whether difficult or unusual state laws are at issue; (3) whether there is a need for coherent state doctrine in the area; and (4) whether state procedures indicate a desire to create special state forums to adjudicate the issues presented." *Corcoran,* 921 F.2d at 708–09.

■■■ Defendants here fail to even escape the starting gate in a race for abstention. This suit is based entirely upon a facial chal-

---

**4.** Defendants' argument on this point is somewhat perplexing. Essentially, they argue that western coal is simply not a cost-effective alternative and that use of such coal would not increase even in the absence of the statute. If this is true, there seems little reason for the state to so vigorously defend the provision in the statute which appears to be violative of the federal Constitution.

lenge to the constitutionality of a state statute. Actions challenging state statutes as unconstitutional on their face are particularly inappropriate candidates for abstention by a federal court on *Burford* grounds, even if the challenged statutes are part of a state regulatory scheme. *New Orleans*, 491 U.S. at 358–59, 109 S.Ct. at 2513; *Zwickler v. Koota*, 389 U.S. 241, 253, 88 S.Ct. 391, 398, 19 L.Ed.2d 444 (1967); *Public Utils. Comm'n of Ohio v. United Fuel Gas Co.*, 317 U.S. 456, 469, 63 S.Ct. 369, 376, 87 L.Ed. 396 (1943); *Corcoran*, 921 F.2d at 709; *Bath Memorial Hosp. v. Maine Health Care Fin. Comm'n*, 853 F.2d 1007, 1013 (1st Cir.1988). *See generally* Gordon G. Young, *Federal Court Abstention and State Administrative Law from* Burford *to* Ankenbrandt: *Fifty Years of Judicial Federalism Under* Burford v. Sun Oil Co. *and Kindred Doctrines*, 42 DePaul L.Rev. 859, 925 (1993). Abstention is not required where, as here, the question of the constitutionality of the challenged state action is clear and uncomplicated and purely one to be answered by looking to Commerce Clause decisions of the Supreme Court and other federal courts which transcend the law of any particular state. *See New Orleans*, 491 U.S. at 362, 109 S.Ct. at 2515; *Alleghany Corp. v. Eakin*, 712 F.Supp. 716 (S.D.Ind. 1989), *aff'd sub nom. Alleghany Corp. v. Haase*, 896 F.2d 1046 (7th Cir.1990). *See also Oregon Waste Sys., Inc. v. Department of Envtl. Quality*, — U.S. —, —, 114 S.Ct. 1345, 1349–50, 128 L.Ed.2d 13 (1994); *Government Suppliers Consol. Servs., Inc. v. Bayh*, 975 F.2d 1267, 1274 (7th Cir.1992), *cert. denied*, — U.S. —, 113 S.Ct. 977, 122 L.Ed.2d 131 (1993). The dispositive fact in the instant case which makes abstention inappropriate is that Plaintiff seeks a determination concerning the facial constitutionality of the statute, not an individualistic review of particular fact-specific regulatory decisionmaking. Accordingly, *Burford* abstention is inappropriate in the particular circumstances of this case.

## B. *Colorado River* Abstention

■ Defendants further contend that the court should abstain from proceeding further in this action under the *Colorado River* doctrine because of the appeal presently pending in the Indiana Court of Appeals in *General Motors v. Indianapolis Power & Light Co.*, No. 90A02–9309–EX–489. *General Motors* is an appeal of a decision by the IURC approving an environmental compliance plan submitted by Indianapolis Power & Light Co. pursuant to the statute at issue here. Alliance is not a party to the state court action which does, in part, challenge the constitutionality of the statute.

"Under the doctrine set forth in *Colorado River*, a federal court may stay or dismiss a suit in exceptional circumstances when there is a concurrent state proceeding and the stay or dismissal would promote 'wise judicial administration.' *Caminiti & Iatarola, Ltd. v. Behnke Warehousing, Inc.*, 962 F.2d 698, 700 (7th Cir.1992). *See also Hartford Casualty Ins. Co. v. Borg–Warner Corp.*, 913 F.2d 419, 425 (7th Cir.1990). The "initial step in determining whether the *Colorado River* doctrine is applicable is to inquire whether the concurrent state and federal proceedings are parallel." *Caminiti*, 962 F.2d at 700. " 'It is important to note that 'the requirement is of parallel suits, not identical suits. A 'suit is 'parallel' when substantially the same parties are contemporaneously litigating substantially the same issues in another forum....' ' " *Id.* (quoting *Interstate Material Corp. v. City of Chicago*, 847 F.2d 1285, 1288 (7th Cir.1988) (quoting *Calvert Fire Ins. Co. v. American Mut. Reins. Co.*, 600 F.2d 1228, 1229 n. 1 (7th Cir.1979))). As noted previously, the presumption in such a case is against abstention. *Allendale Mut. Ins. Co. v. Bull Data Sys., Inc.*, 10 F.3d 425, 430 (7th Cir.1993).

Although the state court proceeding is, in part, considering the constitutional question at issue here, the two proceedings are plainly not parallel. First, because one of the basic tenets of jurisprudence precludes reaching a constitutional question if an issue may be disposed of on other grounds, the state court may not even reach the question at issue here. Second, there is no party to the Indiana state court proceeding with interests aligned closely enough with those of Plaintiff in the instant case so that the court may find that Plaintiff's interests will be adequately vindicated in that action. The state court action is an appeal of a very fact-specific

administrative ruling under the statute at issue. Other than the fact that the constitutionality of the statute is a peripheral issue in that case, there is no connection whatsoever between that appeal and this action.

Even if the two actions could be considered "parallel," *Colorado River* abstention would be inappropriate in these circumstances. Once a determination has been made that the state and federal proceedings are substantially similar, "there are at least ten factors that a district court can consider in deciding whether 'exceptional circumstances' exist that would justify deference to the state courts under the *Colorado River* doctrine.... 1) whether the state has assumed jurisdiction over property; 2) the inconvenience of the federal forum; 3) the desirability of avoiding piecemeal litigation; 4) the order in which jurisdiction was obtained by the concurrent forums; 5) the source of governing law, state or federal; 6) the adequacy of state-court action to protect the federal plaintiff's rights; 7) the relative progress of the state and federal proceedings; 8) the presence or absence of concurrent jurisdiction; 9) the availability of removal; and 10) the vexatious or contrived nature of the federal claim." *LaDuke v. Burlington N.R.R. Co.*, 879 F.2d 1556, 1559 (7th Cir.1989) (citations omitted). *See Locke v. Bonello*, 965 F.2d 534, 537 (7th Cir.1992). "No one factor is necessarily determinative; a carefully considered judgment taking into account both the obligation to exercise jurisdiction and the combination of factors counselling against that exercise is required." *Colorado River*, 424 U.S. at 818–19, 96 S.Ct. at 1247.

In the instant case, several of the above factors counsel against abstention. First, this case does not involve any property over which the state has assumed jurisdiction. Second, the federal forum, far from being inconvenient, is a particularly appropriate place to decide the instant issue. Third, decision of the instant question will not in any way lead to piecemeal litigation. If the statute is unconstitutional, the state court proceeding is likely moot; if not, the state court may then fully address the merits of the claim before it. Fourth, the law governing the instant question is clearly federal.

Fifth, this proceeding is presently ripe for decision. Sixth, removal of the state court proceeding is not appropriate. And, finally, the federal claim at issue here is meritorious and is clearly neither contrived nor vexatious. Therefore, even though (1) there is concurrent jurisdiction to decide the instant question; (2) the state court is an adequate venue to vindicate the rights in question; and (3) the state court had jurisdiction over the question before this suit was filed, abstention is not appropriate. Accordingly, the considerations of " '[w]ise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation,' " *Rosser v. Chrysler Corp.*, 864 F.2d 1299, 1306 (7th Cir.1988) (quoting *Colorado River*, 424 U.S. at 817, 96 S.Ct. at 1246)), dictate that Defendants' motion for the court to abstain under either the *Burford* or *Colorado River* doctrines must be **DENIED.**

## IV. Summary Judgment Standard

The Seventh Circuit stated the standard for summary judgment in *Howland v. Kilquist*, 833 F.2d 639 (7th Cir.1987).

> Fed.R.Civ.P. 56(c) provides that a district court shall grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." When the facts are disputed, the parties must produce proper documentary evidence to support their contentions, and may not rest on mere allegations in the pleadings, *Posey v. Skyline Corp.*, 702 F.2d 102, 105 (7th Cir.), *cert. denied*, 464 U.S. 960, 104 S.Ct. 392, 78 L.Ed.2d 336 (1983), or upon conclusory statements in affidavits. *First Commodity Traders v. Heinold Commodities, Inc.*, 766 F.2d 1007, 1011 (7th Cir.1985). In reviewing a grant of summary judgment, all reasonable inferences from the evidence presented must be drawn in favor of the opposing party. *Matsushita Elecs. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 [106 S.Ct. 1348, 1356, 89 L.Ed.2d 538] (1986).... The mere existence of a factual dispute will not bar summary judgment

unless "the disputed fact is outcome determinative under governing law." *Egger v. Phillips,* 710 F.2d 292, 296 (7th Cir.) (en banc), *cert. denied,* 464 U.S. 918 [104 S.Ct. 284, 78 L.Ed.2d 262] (1983).

*Id.* at 642.

The Supreme Court further clarified the scope of Federal Rule of Civil Procedure 56 in *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) and *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In *Celotex,* the Court held that the initial burden is on the moving party to demonstrate "with or without affidavits" the absence of genuine issues of material fact and that, absent such material facts, judgment should be granted as a matter of law in the moving party's favor. 477 U.S. at 323, 106 S.Ct. at 2553. Once the moving party has met its burden, the opposing party must "go beyond the pleadings" and designate specific facts to support or defend each element of the claim, demonstrating a genuine issue for trial. *Celotex,* 477 U.S. at 322–23, 106 S.Ct. at 2552; *Becker v. Tenenbaum–Hill Assocs., Inc.,* 914 F.2d 107, 110 (7th Cir.1990). Not every factual dispute creates a barrier to summary judgment, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.

### V. Cross Motions for Summary Judgment

Alliance contends that the ECPA impermissibly favors in-state interests by requiring the IURC to base a portion of its prudency review on whether the measures set forth in the proposed 1990 CAAA compliance plan would either maintain or increase the use of Indiana coal. Alliance asserts that the ECPA burdens interstate commerce and is unconstitutional on its face and in effect. Defendants respond that the ECPA does not violate the Commerce Clause on its face or in effect, and asserts, in the alternative, that the ECPA is justified by legitimate state interests.

The first major portion of the statute to which Plaintiff asserts its constitutional challenge is section 8–1–27–6(b)(6)(A). This section provides that if the plan submitted by the utility proposes a change in fuel type which would lead to a diminished use of Indiana coal, the utility must also submit an analysis of the following:

(i) The economic and employment effects of the proposed change of fuel type on the regions of Indiana in which the mining of coal provides employment....

(ii) The effects of the proposed modification on the preservation of the mining of Indiana coal as a viable source of fuel.

IND.CODE ANN. § 8–1–27–6(b)(6)(A) (Burns Supp.1994). Plaintiff then challenges section 8–1–27–8(1)(D), which provides that before the IURC can approve the plan, it must find that the plan either:

(i) Provides for continued or increased use of Indiana coal in the coal-consuming electric generating units owned or operated by the public utility and affected by the Clean Air Act Amendments of 1990; or

(ii) If the plan does not provide for continued or increased use of Indiana coal, such nonprovision is justified by economic considerations including the effects in the regions of Indiana in which the mining of coal provides employment....

IND.CODE ANN. § 8–1–27–8(1)(D) (Burns 1991). Plaintiff also challenges section 8–1–27–20, which provides for annual reviews of compliance plans which result in the diminished use of Indiana coal. IND.CODE ANN. § 8–1–27–20 (Burns 1991). Intervenor Defendant PSI subsequently filed a cross-motion for summary judgment which essentially concedes that no issues of material fact exist and contends that the court should find that the statute is constitutional.

■ Analysis of the statute in question begins with the presumption that such statute is presumed to be constitutional. *Bowen v. Kendrick,* 487 U.S. 589, 617, 108 S.Ct. 2562, 2578, 101 L.Ed.2d 520 (1988) (reviewing federal statute); *Hines v. Elkhart Gen. Hosp.,* 465 F.Supp. 421 (N.D.Ind.), *aff'd,* 603 F.2d 646 (7th Cir.1979). *Cf. Eddy v. McGinnis,* 523 N.E.2d 737 (Ind.1988) (every enactment by the state legislature that is chal-

lenged before the Indiana Supreme Court is presumed to be constitutional). It is clear that the interstate sale of coal is commerce; thus, any statute or regulation affecting this commerce must pass constitutional muster under the federal Commerce Clause. U.S. CONST. art. 1, § 8, cl. 3.

The Commerce Clause of the United States Constitution grants Congress the power "[t]o regulate Commerce ... among the several States." U.S. CONST. art. 1, § 8, cl. 3. While the clause is silent as to how much power a state retains to regulate economic activities within its borders, for more than one hundred year the United States Supreme Court has held that the Commerce Clause also includes a prohibition on states from taking certain actions even absent congressional action. *Oregon Waste Sys.*, —— U.S. at ——, 114 S.Ct. at 1349; *CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69, 87, 107 S.Ct. 1637, 1648, 95 L.Ed.2d 67 (1987).[5] *See, e.g., Lewis v. BT Inv. Managers, Inc.*, 447 U.S. 27, 35, 100 S.Ct. 2009, 2015, 64 L.Ed.2d 702 (1980); *Hughes v. Oklahoma*, 441 U.S. 322, 326, 99 S.Ct. 1727, 1731, 60 L.Ed.2d 250 (1979); *H.P. Hood & Sons, Inc.*, 336 U.S. at 535, 69 S.Ct. at 663 ("[T]his Court has advanced the solidarity and prosperity of this Nation by the meaning it has given to these great silences of the Constitution."). In the context of a Commerce Clause case, Justice Cardozo observed that the Constitution "was framed upon the theory that the peoples of the several states must sink or swim together, and that in the long run prosperity and salvation are in union and not division." *Baldwin v. G.A.F. Seelig, Inc.*, 294 U.S. 511, 523, 55 S.Ct. 497, 500, 79 L.Ed. 1032 (1935). Thus, the clause has been applied to assure that no state can thwart the ideal that the basic economic unit is the nation and that "the future of our Nation depends not on how certain parts of it fare but on how it does as a whole." *Dutchess Sanitation Serv., Inc. v. Town of Plattekill*, 51 N.Y.2d 670, 435

N.Y.S.2d 962, 417 N.E.2d 74, 76 (1980). Indeed, Indiana businesses have benefitted from this use of the dormant Commerce Clause. *New Energy Co. v. Limbach*, 486 U.S. 269, 108 S.Ct. 1803, 100 L.Ed.2d 302 (1988) (Court strikes down an Ohio tax credit law that exempted from taxation the sale of Ohio-produced ethanol on grounds that the law discouraged the sale of Indiana-produced ethanol in Ohio).

A state statute may violate the Commerce Clause either by discriminating against out-of-state economic interests or by benefitting in-state interests. *See Bacchus Imports, Ltd. v. Dias*, 468 U.S. 263, 273, 104 S.Ct. 3049, 3056, 82 L.Ed.2d 200 (1984) ("[I]t is irrelevant to the Commerce Clause inquiry that the motivation of the legislature was the desire to aid [in-state interests] rather than to harm out-of-state producers."); *Limbach*, 486 U.S. at 273–74, 108 S.Ct. at 1807. Thus, the court must determine whether the challenged portions of the ECPA are just "protectionist measure[s], or whether [the Act] can fairly be viewed as a law directed to legitimate local concerns, with effects upon interstate commerce that are only incidental." *City of Philadelphia v. New Jersey*, 437 U.S. 617, 624, 98 S.Ct. 2531, 2535, 57 L.Ed.2d 475 (1978).

A statute may violate the Commerce Clause even without demonstrable economic effects.[6] The Supreme Court has held that "where discrimination is patent ... neither a widespread advantage to in-state interests nor a widespread disadvantage to out-of-state competitors need be shown." *Limbach*, 486 U.S. at 276, 108 S.Ct. at 1809. If a statute clearly is designed to burden interstate commerce, it is repugnant to the Commerce Clause regardless of the amount of commerce actually affected. *See Bacchus Imports*, 468 U.S. at 269, 104 S.Ct. at 3054.

---

5. Congress may authorize the states to engage in regulation that the Commerce Clause would otherwise prohibit. *See South–Central Timber Dev., Inc. v. Wunnicke*, 467 U.S. 82, 91, 104 S.Ct. 2237, 2242, 81 L.Ed.2d 71 (1984) (Congress's authorization must be "unmistakably clear"). No such argument is made here.

6. "[T]he negative implications of the commerce clause derive principally from a *political* theory of union, not from an *economic* theory of free trade." LAURENCE H. TRIBE, AMERICAN CONSTITUTIONAL LAW, §§ 6–7 (2d ed. 1988) (emphasis in original).

 This limitation on state regulatory power, however, is not absolute. The states retain authority under their general police powers to regulate matters of legitimate local concern even though interstate commerce is affected. *Lewis,* 447 U.S. at 36, 100 S.Ct. at 2015; *Maine v. Taylor,* 477 U.S. 131, 138, 106 S.Ct. 2440, 2447, 91 L.Ed.2d 110 (1986). When such a state regulation is challenged as a violation of the dormant Commerce Clause, it will be subjected to one of two tests, depending upon the discriminatory nature of the statute. The first test applies if a statute is discriminatory on its face or in practical effect. The state bears the burden of justifying the discrimination by showing the following: (1) the statute has a legitimate local purpose; (2) the statute serves this interest; and (3) nondiscriminatory alternatives, adequate to preserve the legitimate local purpose, are not available. *See Hughes v. Oklahoma,* 441 U.S. at 336, 99 S.Ct. at 1736; *Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 353, 97 S.Ct. 2434, 2446, 53 L.Ed.2d 383 (1977); *Dean Milk Co. v. City of Madison,* 340 U.S. 349, 354, 71 S.Ct. 295, 298, 95 L.Ed. 329 (1951). "If a restriction on commerce is discriminatory, it is virtually *per se* invalid." *Oregon Waste Sys.,* —— U.S. at ——, 114 S.Ct. at 1350. The Supreme Court stated the second commerce clause test in *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970): "[w]here the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Id.* at 142, 90 S.Ct. at 847.

 The ECPA clearly imposes a facial and patent burden on interstate commerce. It is plainly protectionist to the extent that it requires the IURC to consider the effects a utility's 1990 CAAA compliance plan may have on the Indiana coal industry and imposes restrictions on approval of the plan based upon the plan's effects on the Indiana coal industry. The ECPA cannot be justified on the grounds that it protects the state of Indiana and its citizens from economic harm which could result from a decline in the state's coal industry as a consequence of compliance with the 1990 CAAA.[7] "Preservation of local industry by protecting it from the rigors of interstate competition is the hallmark of economic protectionism that the Commerce Clause prohibits." *West Lynn Creamery, Inc. v. Healy,* —— U.S. ——, ——, 114 S.Ct. 2205, 2217, 129 L.Ed.2d 157 (1994). The obvious intent of the challenged portions of the ECPA was to limit or eliminate the use of western coal in Indiana generating plants with an eye toward promoting instead the use of high sulfur coal, preferably that mined in Indiana. This is exactly the type of statute the dormant Commerce Clause prohibits. *See, e.g., Miller,* 44 F.3d at 596–97. Therefore, the challenged portions of the ECPA fail to pass constitutional muster because they fail to promote any "legitimate" local interest.[8]

Defendants argue that any possible violative effect on interstate commerce is totally ameliorated by the fact that the ECPA is a completely voluntary statute. A utility need not obtain the advance approval for its compliance plan allowed by the statute. Rather, a utility can implement its plan and later seek approval for the increased rates the plan engenders. This argument is particularly specious.

A utility which elects not to avail itself of the pre-approval procedures of the ECPA may still recover its fuel costs through a fuel adjustment charge pursuant to section 8–1–2–42(d) of the Indiana Code.[9] IND.CODE ANN.

---

7. The state argues that even in the absence of the statute there would be no effect on the local coal industry because use of high sulfur local coal and scrubbers is clearly more cost-effective over the long run than the use of western coal. This contention is puzzling because, if true, it renders the protectionist portions of the ECPA meaningless and clearly unsupported by any state interest whatsoever.

8. Clearly, protecting the Indiana coal industry is a local interest, it is simply not one which the federal Constitution considers "legitimate."

9. Section 8–1–2–42(d) provides in pertinent part: An electric generating utility may apply for a change in its fuel charge not more often than each three (3) months.... The commission ... shall grant the electric utility the requested fuel cost charge if it finds that:

§ 8–1–2–42(d) (Burns 1991). While this is true, the voluntariness of the ECPA is a mere fallacy. In complying with the 1990 CAAA, a utility may (1) use lower sulfur coal; (2) install scrubbers and use higher sulfur coal; or (3) purchase pollution allocations from other utilities. The court will hereafter ignore the third option because no party has alleged that it is any more than an interim solution.

A utility which chooses option one will convert its plants to operate using low sulfur western coal. Given the requirements within the ECPA, the utility will likely forego the pre-approval procedure and seek a fuel adjustment under section 8–1–2–42. The IURC will then consider the cost-effectiveness of the utility's choice, with option two as a potential alternative. If the IURC determines that option two was a more cost-effective alternative, it has the option of denying the rate adjustment. A utility which chooses option two at the outset will avail itself of the provisions of the ECPA and seek pre-approval of its plan to install scrubbers and burn high sulfur coal. If the IURC determines, even considering the possible effects on the local coal industry, that it would be more cost effective for the utility to use western coal, then the utility will be effectively pre-ap-

proved for a rate increase to cover the increased fuel costs. IND.CODE ANN. § 8–1–27–12 (Burns 1991).

The problem with this system is obvious. A corporate officer charged with fiduciary duties toward the company would be virtually required to seek pre-approval of the utility's compliance plan. Failure to do so could result in the utility entering into a contract for the purchase of more expensive western coal for which the IURC may refuse to provide a rate increase. The only way for the utility to ensure it will receive the necessary rate increases to finance its 1990 CAAA compliance plan is to avail itself of the procedures provided by the ECPA. Accordingly, the utility will be faced with the barely veiled choice of installing new scrubbers and using local coal or traversing the uphill slope of seeking approval to use western coal which would require the utility to demonstrate that the cost savings offsets the damage done to the Indiana coal industry.[10] It is plain that the ECPA is "voluntary" in word alone. As much as the state may protest that a utility may avoid the ECPA entirely, only a corporate officer who had little love for his position would actually do so. As a result of the above discussion, the court finds that the

(1) The electric utility has made every reasonable effort to acquire fuel and generate or purchase power or both so as to provide electricity to its retail customers at the lowest fuel cost reasonably possible....

IND.CODE ANN. § 8–1–2–42(d) (Burns 1991).

10. A major flaw in Defendants' logic seems to be the implied notion that a utility actually cares more about using the most cost-effective alternative in complying with the 1990 CAAA than it cares about lowering its potential risk of loss. This assumes that a utility would be so offended by the Indiana coal requirements that it would avoid the path of absolute certainty in favor of a path fraught with danger. In fact, given the present nature of the ECPA, the only logical alternative for any Indiana utility when faced with the necessity of making changes to comply with the 1990 CAAA is to seek pre-approval of a plan to install scrubbers and use Indiana coal. The utility would not particularly care which alternative was most cost effective for its customers because the utility knows it will receive full reimbursement once the plan is approved. The customers may not receive the benefits of the most cost effective plan from the utility's perspective, because the ECPA forces those consum-

ers to essentially subsidize the Indiana coal industry. The other loser in this system are the western coal producers represented by Alliance who are effectively shut out of the system.

Defendants' argument that the ECPA cannot be deemed mandatory because not all Indiana utilities have availed themselves of its provisions is also meritless. Defendants argue that only three of Indiana's five largest utilities have filed plans under the ECPA. The court finds that Northern Indiana Public Service Company ("NIPSCO"), one of the utilities which has failed to file a compliance plan under the ECPA, has not done so because the utility is already in compliance with the 1990 CAAA and will not need to make further expenditures toward compliance until some time in the future. (Ex. A to Mem. of Amicus Curiae of The Ind. Elec. Ass'n, Kern Dep. at 2–3.) Accordingly, NIPSCO has already run the gauntlet and assumed the risk inherent in seeking a fuel adjustment following its compliance action. It is in no way reasonable to infer that NIPSCO will not seek pre-approval under the ECPA the next time it must undertake a major adjustment to maintain compliance with the 1990 CAAA. Defendants' arguments that the ECPA is a purely voluntary statute are totally without merit.

challenged portions of the ECPA are facially violative of the Commerce Clause of the United States Constitution. The statute is voluntary in form but not in substance and acts as a mandatory and impermissible impediment to interstate commerce. The state can demonstrate no legitimate local purpose—other than protectionism, which is simply not a "legitimate" purpose. Accordingly, the court finds the ECPA to be unconstitutional; Plaintiff's motion for summary judgment is hereby **GRANTED** and Defendants' cross-motion for summary judgment is hereby **DENIED.**

## VI. Severability of the Violative Provisions

■ The Indiana Code contains a severability clause which applies to every provision of the Indiana Code. IND.CODE ANN. 1–1–1–8 (Burns 1993). The severability clause creates a presumption that the legislature intended to allow the remainder of a statute to remain in effect. *Indiana Educ. Employment Relations Bd. v. Benton Community Sch. Corp.,* 266 Ind. 491, 365 N.E.2d 752, 761–62 (1977); *See, e.g., Clem v. Steveco, Inc.,* 450 N.E.2d 550, 553 (Ind.Ct.App.1983). Indiana's severability statute states that, except in the case of an act containing a specific non-severability clause, if any provision of the statute is held invalid, the remainder of the statute should be left intact unless certain exceptions apply.[11] IND.CODE ANN. § 1–1–1–8(b) (Burns 1993). Thus, under Indiana law, "[i]f the provisions of an act are severable so that the unconstitutional provision may be deleted without destroying the general purpose or effectiveness of the act, the remaining portion will be upheld as valid." *Indiana Waste Sys., Inc. v. Board of Comm'rs of Howard County,* 180 Ind.App.

385, 389 N.E.2d 52, 61 (Ind.Ct.App.1979). *See also Indiana Voluntary Firemen's Ass'n, Inc. v. Pearson,* 700 F.Supp. 421, 448 (S.D.Ind.1988); *Kinslow v. Cook,* 165 Ind. App. 623, 333 N.E.2d 819, 822 (Ind.Ct.App. 1975).

■ The primary purpose of the ECPA is to provide a process whereby a utility may have its 1990 CAAA compliance plan pre-approved by the IURC, thus ensuring cost recovery for capital expenditures within approved estimates. The challenged provisions are not essential to achieving this objective. The challenged portions of the statute may therefore be removed without destroying the overall purpose or effectiveness of the statute.

The exceptions to the presumption of severability set forth in the severability statute are not applicable to the ECPA. IND.CODE ANN. § 1–1–1–8(b) (Burns 1993). The first exception look to whether the remainder of the Act is so essentially connected with and dependent upon the invalid provisions of the statute that the court cannot presume that the legislature would have enacted the remainder without the offending portions. IND. CODE ANN. § 1–1–1–8(b)(1) (Burns 1993). The challenged provisions of the ECPA are merely one factor included in the criteria governing the submission of compliance plans to the IURC, the review of compliance plans by the IURC and the subsequent annual review of compliance plans. IND.CODE ANN. §§ 8–1–27–6(b)(6)(A), 8–1–27–8(1)(D), 8–1–27–20 (Burns 1991 & Supp.1994). The ECPA provides regulatory pre-approval of compliance plans in exchange for regulatory assurance that the plan will meet or exceed the requirements of the 1990 CAAA and is a

---

11. Section 1–1–1–8 provides:

**Severability.**—(a) If any provision of this Code as now or later amended or its application to any person or circumstance is held invalid, the invalidity does not affect other provisions that can be given effect without the invalid provision or application.

(b) Except in the case of a statute containing a nonseverability provision, each part and application of every statute is severable. If any provision or application of a statute is held invalid, the invalidity does not affect the remainder of the statute unless:

(1) The remainder is so essentially and inseparably connected with, and so dependent upon, the invalid provision or application that it cannot be presumed that the remainder would have been enacted without the invalid provision or application; or

(2) The remainder is incomplete and incapable of being executed in accordance with the legislative intent without the invalid provision or application.

This subsection applies to every statute, regardless of whether enacted before or after the passage of this subsection. . . .

IND.CODE ANN. § 1–1–1–8 (Burns 1993).

reasonable and least-cost strategy over the life of the investment consistent with providing reliable, efficient and economical electric service. IND.CODE ANN. § 8–1–27–8(1) (Burns 1991). The challenged provisions could, therefore, be removed from the ECPA without destroying the essential purpose of the statute. Overall, the ECPA is not so essentially connected with and dependant upon the specific provisions challenged herein that it cannot be presumed that the legislature would have enacted the remainder without the invalid provisions.

The second exception contained in Indiana's severability statute looks to whether the remainder of an act is "incomplete and incapable of being executed without the invalid provision or application." IND.CODE ANN. § 1–1–1–8(b)(2) (Burns 1993). As previously discussed, the challenged portions of the ECPA concern only one factor among several that govern whether the IURC will pre-approve a utility's compliance plan. The other procedures and provisions governing pre-approval can continue to function without the challenged provisions. Section 8–1–27–8(1) sets out four factors the IURC must consider before approving a utility's compliance plan, only one of which concerns the effect of the plan on the Indiana coal industry. *See* IND.CODE ANN. § 8–1–27–8(1) (Burns 1991). Even if that factor were removed, the mechanism for reviewing compliance plans would remain intact. Thus, if the challenged provisions of the ECPA are removed, the remainder would not be incomplete or incapable of being executed. *See* IND.CODE ANN. § 1–1–1–8(b)(2) (Burns 1993).

All of these factors militate against total invalidation of the statute and in favor of severing the violative provisions. The court, therefore, will exercise its authority under section 1–1–1–8 of the Indiana Code and find that the following portions of the ECPA should be severed from the statute as unconstitutional:

(1) The entirety of sub-section 6 of section 8–1–27–6(b) of the Indiana Code.

(2) The entirety of subsection D of section 8–1–27–8(1) of the Indiana Code.

(3) The entirety of section 8–1–27–20 of the Indiana Code.

The remainder of the ECPA will remain in full force and effect and is totally unaffected by the rulings contained herein.

## VII. Conclusion

For the reasons stated herein, the court finds as follows: (1) Defendants' motions to dismiss for lack of subject matter jurisdiction are hereby **DENIED**; (2) Defendants' motion for the court to abstain under either the *Burford* or *Colorado River* doctrines is hereby **DENIED**; (3) the ECPA is unconstitutional in part, therefore, Plaintiff's motion for summary judgment is hereby **GRANTED** and Defendants' cross-motion for summary judgment is hereby **DENIED**; and (4) the violative portions of the ECPA may be severed from the remainder of the statute as provided herein. Judgment will be entered in a separate order accompanying this entry.

ALL OF WHICH IS ORDERED.

## APPENDIX A

**"Clean Air Act" defined.**—As used in this chapter, "Clean Air Act" refers to the federal Clean Air Act (42 U.S.C. 7401 et seq.) and regulations adopted under the federal Clean Air Act.

IND.CODE ANN. § 8–1–27–1 (Burns 1991).

**"Clean Air Act Amendments of 1990" defined.**—As used in this chapter, "Clean Air Act Amendments of 1990" refers to Title IV, Acid Deposition Control, of the federal Clean Air Act Amendments of 1990 (P.L. 101–549) and regulations adopted under the federal Clean Air Act Amendments of 1990.

IND.CODE ANN. § 8–1–27–2 (Burns 1991).

**"Environmental compliance plan" defined.**—As used in this chapter, "environmental compliance plan" means a plan developed by a public utility to comply in whole or in part with the requirements of the Clean Air Act Amendments of 1990.

IND.CODE ANN. § 8–1–27–3 (Burns 1991).

**"Indiana coal" defined.**—As used in this chapter, "Indiana coal" means coal from a mine whose coal deposits are located in the ground wholly or partially in Indiana re-

gardless of the location of the mine's tipple.

IND.CODE ANN. § 8–1–27–4 (Burns 1991).

**"Public utility" defined.**—As used in this chapter, "public utility" means a public utility, a municipally owned utility, or a cooperatively owned utility.

IND.CODE ANN. § 8–1–27–5 (Burns 1991).

**"Change of fuel type" defined.**—As used in this chapter, "change of fuel type" means any change in the fuel, including a change from Indiana coal, used by a public utility.

IND.CODE ANN. § 8–1–27–5.5 (Burns Supp. 1994).

**Voluntary submission of environmental compliance plan—Items required.**—(a) A public utility that has at least one (1) generating unit affected by Section 404 (Phase I) or Section 405 (Phase II) of the Clean Air Act Amendments of 1990 may voluntarily submit a verified environmental compliance plan that sets forth the manner in which the public utility intends to comply with the requirements of the Clean Air Act Amendments of 1990 to the commission for the commission's review and approval under this chapter.

(b) An environmental compliance plan described in subsection (a) must include any information that the commission may reasonably require. The commission shall require a plan described in subsection (a) to include at least the following information:

(1) A description of the requirements of the Clean Air Act Amendments of 1990 applicable to each generating unit owned or operated by the public utility.

(2) A description of the measures the public utility proposes to implement to comply with the requirements.

(3) The schedule under which the public utility proposes to implement the measures.

(4) An estimate of the cost of implementing each of the measures proposed by the public utility.

(5) An analysis of the comparative estimated costs of meeting the applicable requirements of the Clean Air Act Amendments of 1990 through the measures proposed by the public utility and other alternative compliance measures considered by the public utility.

(6) For all compliance plans submitted to the commission after July 1, 1993, if an environmental compliance plan proposes a change of fuel type from the fuel type consumed in the public utility's generating units and that change of fuel type would result in the displacement or diminished use of Indiana coal from the quantity of Indiana coal consumed by the public utility during the calendar year 1990, or an average of the quantity of Indiana coal consumed by the utility in calendar years 1990, 1991, and 1992, whichever is submitted by the utility in the plan, the public utility shall submit the following as part of the environmental compliance plan:

(A) An analysis of the following:

(i) The economic and employment effects of the proposed change of fuel type on the regions of Indiana in which the mining of coal provides employment, and on the service territory of the public utility.

(ii) The effects of the proposed modification on the preservation of the mining of Indiana coal as a viable source of fuel.

The analyses required under this clause must include a comparison of the effects likely to result from the alternative compliance measures identified under subdivision (5).

(B) Information describing the availability, the reliability, the current costs, and the projected future costs of the fuel type proposed for use in connection with the environmental compliance plan.

IND.CODE ANN. § 8–1–27–6 (Burns Supp. 1994).

**Public hearings.**—The commission shall hold a public hearing for each environmental compliance plan submitted by a public utility under this chapter. The public utility shall publish a notice of the filing of its

petition for approval of an environmental compliance plan in one (1) newspaper of general circulation published in each county in which the public utility renders service. The provisions of IC 8-1-2-62 through IC 8-1-2-67 apply to a public hearing held under this section.

IND.CODE ANN. § 8-1-27-7 (Burns 1991).

**Requirements for approval of plan.**—The commission shall issue an order approving an environmental compliance plan if the commission:

(1) Finds that the environmental compliance plan:

(A) Is reasonably designed to meet or exceed the applicable requirements of the Clean Air Act Amendments of 1990;

(B) Constitutes a reasonable and least cost strategy over the life of the investment consistent with providing reliable, efficient, and economical electrical service;

(C) Is in the public interest; and

(D) Either:

(i) Provides for continued or increased use of Indiana coal in the coal-consuming electric generating units owned or operated by the public utility and affected by the Clean Air Act Amendments of 1990; or

(ii) If the plan does not provide for continued or increased use of Indiana coal, such nonprovision is justified by economic considerations including the effects in the regions of Indiana in which the mining of coal provides employment and in the service territory of the public utility; and

(2) Approves the cost and schedule estimate for developing and implementing the environmental compliance plan.

IND.CODE ANN. § 8-1-27-8 (Burns 1991).

**Rejection of plan—Modified plan.**—(a) If the commission finds that an environmental compliance plan submitted by a public utility does not satisfy the requirements of section 8 [IC 8-1-27-8] of this chapter, the commission may reject the plan.

(b) If a public utility's environmental compliance plan is rejected by the commission, the public utility may voluntarily submit to the commission a modified plan intended to satisfy the requirements of section 8 of this chapter.

(c) A modified plan submitted under subsection (b) shall be considered by the commission under sections 7 and 8 [IC 8-1-27-7 and 8-1-27-8] of this chapter.

(d) A public utility may withdraw a proposed environmental compliance plan without prejudice.

IND.CODE ANN. § 8-1-27-9 (Burns 1991).

**Submission of plan to other governmental agencies.**—A public utility shall submit its environmental compliance plan or modified environmental compliance plan to any applicable state government environmental agency on or before the date that the public utility submits the plan to the commission under this chapter. If there is a conflict between the commission and a federal or state government environmental agency concerning the necessary components of a public utility's environmental compliance plan or modified environmental compliance plan, the determination by the government environmental agency shall control.

IND.CODE ANN. § 8-1-27-10 (Burns 1991).

**Modified environmental compliance plan.**—If a public utility:

(1) Chooses to; or

(2) Because of action by a federal or state government environmental agency, is required to;

modify a part of an environmental compliance plan that has previously been approved by the commission to comply with the requirements of the Clean Air Act, the public utility shall submit a modified environmental compliance plan to the commission for the commission's review. The conflict provisions of section 10 [IC 8-1-27-10] of this chapter apply to a modified

environmental compliance plan submitted under this section.

IND.CODE ANN. § 8–1–27–11 (Burns 1991).

**Actions by public utility following approval of plan.**—(a) If the commission issues an order approving an environmental compliance plan submitted by a public utility under this chapter, the commission shall, absent fraud, concealment, gross mismanagement, or inadequate quality control, allow the public utility to do the following:

(1) If a public utility is allowed by law to earn a return on the public utility's investment, the public utility may add to the fair value of the public utility's property the fair value of a completed capital project, or part of a capital project, that:

(A) Is constructed and consists of:

(i) New systems, equipment, or facilities; or

(ii) Modifications to existing systems, equipment, or facilities; and

(B) Is part of the environmental compliance plan approved by the commission;

up to the amount approved under section 8(2) or 13 [IC 8–1–27–8(2) or 8–1–27–13] of this chapter, whichever is applicable.

(2) The public utility may recover the costs incurred by the public utility in the development and implementation of the approved environmental compliance plan up to the amount approved under section 8(2) or 13 of this chapter, whichever is applicable.

(b) The public utility may not recover costs in excess of the cost estimate approved by the commission under section 8(2) or 13 of this chapter, whichever is applicable, unless the commission finds that the additional costs were necessary and prudent.

(c) Except as provided in subsection (d), costs otherwise recoverable by a public utility under subsections (a) and (b) shall be recovered only through a general rate proceeding for the public utility and, to the extent such costs provide the public utility with a return of, or return on, the public utility's investment in a completed capital project, or a part of a capital project, such costs shall be so recovered only if the capital project, or part of the capital project, is found by the commission to be used and useful.

(d) Costs otherwise recoverable by a public utility under subsections (a) and (b) that also qualify for recovery under IC 8–1–2–6.6 shall be recovered by the public utility when and as provided under IC 8–1–2–6.6.

(e) This section does not apply if the public utility elects the review described in section 19 [IC 8–1–27–19] of this chapter.

IND.CODE ANN. § 8–1–27–12 (Burns 1991).

**Revised cost and schedule estimates.**—(a) If a public utility makes a substantial change in a cost and schedule estimate for developing and implementing an environmental compliance plan or a modified environmental compliance plan after the estimate has been approved by the commission under this chapter, the public utility shall file with the commission for the commission's review and approval the revised cost and schedule estimate.

(b) To the extent the commission approves a revised cost and schedule estimate, the estimate shall be the approved cost and schedule estimate for the plan.

IND.CODE ANN. § 8–1–27–13 (Burns 1991).

**Early or over compliance—Emission credits.**—If the commission finds that an environmental compliance plan or a modified environmental compliance plan approved by the commission under this chapter exceeds the applicable requirements of the Clean Air Act Amendments of 1990 by means of early or over compliance, the commission shall, in the order approving the plan, determine the manner and timing of the applicable ratemaking and regulatory treatment of any emission credits or other additional benefits expected to result from the early or over compliance.

IND.CODE ANN. § 8–1–27–14 (Burns 1991).

**Consideration by commission of change in risk to public utility.**—In a general rate proceeding following the issuance of

an order by the commission approving an environmental compliance plan under this chapter, the commission shall, in reviewing and authorizing the public utility's return, give due consideration to any change in risk to the public utility as a result of the commission's approval of the environmental compliance plan and include in the order issued with respect to the general rate proceeding a finding on the change.

IND.CODE ANN. § 8–1–27–15 (Burns 1991).

**Recovery of expenditures.**—If the commission issues an order under sections 8, 11, or 18 [IC 8–1–27–8, IC 8–1–27–11, or IC 8–1–27–18] of this chapter that approves modifications to a public utility's environmental compliance plan, the commission shall, absent fraud, concealment, gross mismanagement, or inadequate quality control, allow the public utility to recover under sections 12(a) and 12(b) [IC 8–1–27–12(a) and 8–1–27–12(b) ] of this chapter, to the extent permitted under sections 12(a) and 12(b) of this chapter, the following:

(1) The public utility's expenditures made under the environmental compliance plan before the date the commission issued the order approving the modified environmental compliance plan.

(2) The public utility's expenditures made under the modified environmental compliance plan after the date the commission issued the order approving the modified environmental compliance plan.

IND.CODE ANN. § 8–1–27–16 (Burns 1991).

**Cancellation of implementation resulting from withdrawal of the commission's approval.**—If a public utility cancels the implementation of a measure set forth in an environmental compliance plan as a result of an order issued by the commission under section 18 or 19 [IC 8–1–27–18 or 8–1–27–19] of this chapter that withdraws the commission's approval of the inclusion of the measure in the environmental compliance plan, the public utility may, absent fraud, concealment, gross mismanagement, or inadequate quality control, recover:

(1) Over a reasonable time; and

(2) Through the rates of the public utility;

the costs incurred by the public utility in implementing the measure and a reasonable return on the unamortized balance, to the extent the implementation and the costs were approved previously by the commission. The public utility may not recover costs in excess of the cost estimate approved by the commission under section 8(2) or 13 [IC 8–1–27–8(2) or 8–1–27–13] of this chapter, whichever is applicable, unless the commission finds that the additional costs were necessary and prudent.

IND.CODE ANN. § 8–1–27–17 (Burns 1991).

**Review of approval—Order.**—(a) If the commission, after an investigation commenced upon its own initiative or upon a petition of the public utility or a class of persons satisfying the standing requirements of IC 8–1–2–54 (including the office of the utility consumer counselor), finds that substantial changes:

(1) In the need for or estimated cost of an approved environmental compliance plan have occurred; or

(2) In the estimated cost of alternative compliance measures have occurred;

the commission may commence a review of the approval of the environmental compliance plan.

(b) If the commission finds that all or part of an environmental compliance plan no longer meets the requirements of section 8 [IC 8–1–27–8] of this chapter, the commission may, consistent with sections 8 and 10 [IC 8–1–27–8 and 8–1–27–10] of this chapter, issue an order:

(1) Withdrawing the commission's approval of all or part of the environmental compliance plan, whichever is applicable; or

(2) Approving modifications to the environmental compliance plan.

(c) If the commission approves modifications to an environmental compliance plan under subsection (b), the modified environmental compliance plan shall constitute the public utility's approved environmental

compliance plan for purposes of this chapter.

IND.CODE ANN. § 8–1–27–18 (Burns 1991).

**Review of cost and implementation of plan—Order.**—(a) In addition to the review of the continued appropriateness of an environmental compliance plan under section 18 [IC 8–1–27–18] of this chapter, the commission shall, at the request of a public utility, conduct an ongoing review of the cost and implementation of the public utility's approved environmental compliance plan. The public utility that has filed a compliance plan under this chapter shall submit to the commission:

(1) Each year; or

(2) At other times the commission and the public utility agree on;

a progress report that includes any information the commission may require.

(b) If the commission approves the cost and implementation of the part of the environmental compliance plan under review, then, absent fraud, concealment, or gross mismanagement, the approval forecloses subsequent challenges to:

(1) The recovery in rates of those costs; and

(2) If the public utility is allowed by law to earn a return on the public utility's investment, the addition to fair value of the public utility's property of the fair value of a completed capital project, or part of a capital project, that:

(A) Is constructed and consists of:

(i) New systems, equipment, or facilities; or

(ii) Modifications to existing systems, equipment, or facilities; and

(B) Is part of the environmental compliance plan implementation approved by the commission; up to the amount approved under section 8(2) or 13 [IC 8–1–27–8(2) or 8–1–27–13] of this chapter, whichever is applicable. The public utility may not recover costs in excess of the cost estimate approved by the commission under section 8(2) or 13 of this chapter, whichever is

applicable, unless the commission finds that the additional costs were necessary and prudent.

(c) If the commission does not issue an order disapproving all or part of the implementation of the part of the environmental compliance plan under review within six (6) months of the commencement of the commission's review, the commission shall be considered to have approved all of the implementation of that part of the environmental compliance plan, unless the commission issues an order extending the time for such review.

(d) Except as provided in subsection (e), costs otherwise recoverable by a public utility under subsection (b) shall be recovered only through a general rate proceeding for the public utility and, to the extent such costs provide the public utility with a return of, or a return on, the public utility's investment in a completed capital project, or portion of a capital project, such costs shall be so recovered only if the capital project, or portion of the capital project, is found by the commission to be used and useful.

(e) Costs otherwise recoverable by a public utility under subsection (b) that also qualify for recovery under IC 8–1–2–6.6 shall be recovered by the public utility when and as provided under IC 8–1–2–6.6.

(f) This section applies instead of sections 12 and 16 [IC 8–1–27–12 and 8–1–27–16] of this chapter for a public utility that elects the review described in this section.

(g) If the commission disapproves all or part of the implementation of the part of the environmental compliance plan under review:

(1) The commission may , consistent with sections 8 and 10 [IC 8–1–27–8 and 8–1–27–10] of this chapter, issue an order withdrawing the commission's approval of all or part of the environmental compliance plan; and

(2) The public utility may voluntarily submit a modified environmental compliance plan to the commission for the commission's review and approval under this chapter.

If the commission issues an order approving all or part of the modified environmental compliance plan, the environmental compliance plan constitutes the public utility's approved environmental compliance plan for purposes of this chapter.

IND.CODE ANN. § 8–1–27–19 (Burns 1991).

**Annual review.**—The commission shall annually review each environmental compliance plan, the implementation of which has resulted in the displacement or diminished use of Indiana coal and determine whether a different compliance measure would more fully satisfy the requirements of section 8 [IC 8–1–27–8] of this chapter.

IND.CODE ANN. § 8–1–27–20 (Burns 1991).

**Chapter does not extend force majeure rights.**—(a) This chapter does not give a party to a contract for the sale and purchase of coal any greater rights under a force majeure provision of the contract than the party had before July 1, 1991.

(b) The commission may not implement this chapter in a way that would give a party to a contract for the sale and purchase of coal any greater rights under a force majeure provision of the contract than the party had before July 1, 1991.

(c) This chapter does not give the commission the authority to order a public utility to cancel, terminate, amend, or otherwise modify a contract for the purchase and sale of coal.

IND.CODE ANN. § 8–1–27–22 (Burns 1991).

**Use of procedures voluntary.**—(a) Use of the procedures in this chapter is voluntary to a public utility. The failure of a public utility to use the approval provisions of this chapter may not create a presumption of imprudence or nonrecovery in rates for environmental compliance plan costs.

(b) This chapter does not require a public utility to use this chapter to recover a cost or expense otherwise recoverable in the public utility's rates. A higher standard for the recovery of such costs or for determining the appropriateness of an environmental compliance plan may not be imposed because of a public utility's election not to use the provisions of this chapter.

(c) An order of the commission approving an environmental compliance plan under this chapter may not limit or define the measures that may be proposed in a compliance plan submitted by another public utility or approved by the commission.

IND.CODE ANN. § 8–1–27–23 (Burns 1991).