GENERAL MOTORS CORPORATION, Central Soya Company, Inc., Office of Utility Consumer Counselor and Citizens Action Coalition of Indiana, Inc., Appellants,

v.

INDIANAPOLIS POWER & LIGHT COMPANY, Appellee.

No. 93A02–9309–EX–489.

Court of Appeals of Indiana.

June 30, 1995.

Michael A. Mullett, Indianapolis, for Citizens Action Coalition of Indiana, Inc.

John F. Wickes, Jr., Todd A. Richardson, Lewis & Kappes, Indianapolis, for General Motors Corp. & Cent. Soya Co., Inc.

Colleen F. McNenny, Thomas B. Nicholson, Rita J. Baldwin, Indianapolis, for Office of Utility Consumer Counselor.

Marcus E. Woods, Christopher J. Weber, Richard E. Deer, Michael G. Banta, Teresa E. Morton, Barnes & Thornburg, Indianapolis, for appellee.

G. Daniel Kelley, Jr., Edward P. Steegmann, Ice Miller Donadio & Ryan, Indianapolis, amicus curiae.

## OPINION

SHARPNACK, Chief Judge.

General Motors Corporation and Central Soya Company, Inc. (collectively, "IPL-Industrial Group" or "IIG"), the Office of Utility Consumer Counselor ("UCC"), on behalf of all ratepayers of the Indianapolis Power and Light Company ("IPL"), and Citizens Action Coalition of Indiana, Inc. ("CAC") appeal the Order of the Indiana Utility Regulatory Commission ("Commission") approving IPL's environmental compliance plan submitted in fulfillment of the requirements of the Environmental Compliance Plans Act (the "Act"), Ind.Code § 8-1-27-1 *et seq.* We reverse and remand.

The Appellants raise several issues for our review, which we consolidate and restate as the following:

1.  whether the Commission erred in interpreting the statutory prerequisites for pre-approval of environmental compliance plans found in the Act;

2.  whether the Commission improperly shifted the burden of proof to the intervenors;

3.  whether the Commission erred in finding that the plan constitutes "a reasonable and least cost strategy" as required by I.C. § 8-1-27-8(1)(B);

4.  whether the Commission erred in finding that the plan is "in the public interest" as required by I.C. § 8-1-27-8(1)(C);

5.  whether the Commission failed to determine the manner and timing of the applicable regulatory treatment of emission credits; and

6.  whether the "Indiana coal" provisions of the Act are unconstitutional.

*Background*

In 1990, Congress amended the Clean Air Act in an effort to combat acid rain through significant reductions in industrial emissions of sulfur dioxide ($SO_2$) and nitrogen oxides ($NO_x$). *See* 42 U.S.C. § 7651 *et seq.* (hereinafter, the "CAAA"). Public utilities like IPL are subject to and must comply with the emission reduction provisions of the CAAA. Emission requirements for $SO_2$ take effect in two phases: in Phase I, effective January 1, 1995, certain listed units must meet defined limitations (42 U.S.C. § 7651c); in Phase II, effective January 1, 2000, all affected units

must meet defined limitations (§ 7651d). Emission requirements for $NO_x$ are effective at the time a given unit becomes subject to $SO_2$ reduction requirements. Six of IPL's generating stations (E.W. Stout Units 5, 6, and 7, H.T. Pritchard Unit 6, and Petersburg Units 1 and 2) are subject to Phase I requirements.

Under the CAAA, utilities are permitted to choose from a variety of compliance options, including precombustion techniques (such as fuel-switching to oil, natural gas, or low-sulphur coal), new combustion technologies, and post-combustion processes, including flue gas desulfurization units called "scrubbers." The CAAA also created a system of marketable emission "allowances," by which each source is allotted a number of allowances equal to the number of tons of $SO_2$ it is permitted to emit. 42 U.S.C. §§ 7651a(3), 7651b. If the source emits fewer tons, it has excess allowances that may be sold; if it emits more tons, it may achieve compliance in whole or in part by purchasing more allowances.

In response to the CAAA, the Indiana General Assembly enacted the Act in 1991. I.C. § 8–1–27–1 *et seq.* The Act provides a mechanism by which a public utility may voluntarily submit to the Commission for the Commission's review and approval a verified environmental compliance plan, which sets forth the manner in which the public utility intends to comply with the requirements of the CAAA. The pre-approval process is entirely voluntary, and failure to obtain pre-approval does not create any presumption of imprudence or nonrecoverability of compliance expenses. I.C. § 8–1–27–23. If the compliance plan is pre-approved, however, the utility is authorized, absent fraud, concealment, gross mismanagement or inadequate quality control, in its next general rate proceeding, to recover expenses incurred in accordance with the plan and to add to the rate base on which it earns a return through rates the value of completed capital projects or parts thereof. I.C. § 8–1–27–12.

Section 8 of the Act defines the criteria that must be satisfied in order for a compliance plan to be approved.

"The commission shall issue an order approving an environmental compliance plan if the commission:

(1) Finds that the environmental compliance plan:

(A) Is reasonably designed to meet or exceed the applicable requirements of the Clean Air Act Amendments of 1990;

(B) Constitutes a reasonable and least cost strategy over the life of the investment consistent with providing reliable, efficient, and economical electrical service;

(C) Is in the public interest; and

(D) Either:

(i) Provides for continued or increased use of Indiana coal in the coal-consuming electric generating units owned or operated by the public utility and affected by the Clean Air Act Amendments of 1990; or

(ii) If the plan does not provide for continued or increased use of Indiana coal, such nonprovision is justified by economic considerations including the effects in the regions of Indiana in which the mining of coal provides employment and in the service territory of the public utility; and

(2) Approves the cost and schedule estimate for developing and implementing the environmental compliance plan.

I.C. § 8–1–27–8.

The Act further provides that construction projects under approved plans may be eligible for the special rate treatment provided by I.C. § 8–1–2–6.6, under which the Commission may add to a utility's rate base the value of defined "qualified pollution control property" while that property is still under construction. In addition, a proposed environmental compliance plan must include certain information, including the schedule of implementation of the plan, an estimate of the cost of implementing the plan, an analysis of the comparative estimated costs of the proposed plan and alternative plans considered by the utility, and an analysis of the economic and employment effects of a proposed change of fuel type that would result

in the displacement or diminished use of Indiana coal. I.C. § 8–1–27–6(b).

On April 15, 1992, IPL filed its verified petition with the Commission seeking approval of its environmental compliance plan. IPL also sought approval to treat costs expended for the development and implementation of its plan as qualified pollution control property. The plan submitted by IPL provided for reduction of $SO_2$ emissions through installation of scrubbers at its Petersburg Units 1 and 2 (with interim compliance through allowances, emissions dispatching, and/or use of low sulfur coal) and through use of lower sulfur Indiana coal at its other affected units. The plan also contemplated installation of low $NO_x$ burners at the six Phase I-affected units prior to 1995, and at five other affected units by 2000. The plan did not provide for any displacement or diminished use of Indiana coal. Because the plan would result in early and over-compliance with the CAAA, IPL would be entitled to receive allowances pursuant to 42 U.S.C. § 7651b and to sell such allowances on the market as it develops.

The UCC appeared and participated in its statutory capacity on behalf of IPL's ratepayers. See I.C. §§ 8–1–1.1–4.1, 8–1–1.1–5.1. The IIG intervened and participated as industrial ratepayers. CAC also intervened, as did Smith Cogeneration of Indiana, Inc.

The Commission held eighteen days of evidentiary hearings in October, 1992, and March and April, 1993. The Commission issued its order on August 18, 1993, approving IPL's plan and granting related regulatory relief.

### The Order

The Commission approved IPL's cost estimate of $249.5 million, $189.6 million of which was for scrubbing the Petersburg units. The Order also approved IPL's deferred recovery of the costs associated with developing and presenting its plan as "qualified pollution control property."

Additional facts will be supplied as necessary.

### Standard of Review

■ When a statute is challenged as unconstitutional, we must first determine whether the matter may be disposed of upon nonconstitutional grounds. *State of Indiana, Indiana State Police, and Indiana Department of Highways v. Rendleman* (1992), Ind., 603 N.E.2d 1333, 1334. Thus, we address first the nonconstitutional issues raised by the appellants.

Our standard of review of Commission orders was stated recently as follows:

"Ind.Code 8–1–3–1 provides statutory authority for this court to review Commission orders, stating, in pertinent part:

An assignment of errors that the decision, ruling or order of the commission is contrary to law shall be sufficient to present both the sufficiency of the facts found to sustain the decision, ruling, or order, and the sufficiency of the evidence to sustain the finding of facts upon which it was rendered.

Under the two-tier level of review mandated by the statute, this court first determines whether the Commission included in its decision specific findings on all factual determinations material to the ultimate conclusions. *Citizens Action Coalition of Indiana, Inc. v. Nipsco* (1990), Ind.App., 555 N.E.2d 162, 165. Our supreme court has stated that '[the] findings of basic fact must reveal the [Commission's] analysis of the evidence and its determination therefrom regarding the various specific issues of fact which bear on the particular claim.' *Perez v. United States Steel Corp.* (1981), Ind., 426 N.E.2d 29, 33.

Next, this court must determine whether there is substantial evidence in the record to support the Commission's findings of fact. *Citizens Action Coalition, supra.* We are not free, however, to reweigh or reanalyze the evidence presented or substitute our judgment for that of the Commission. *Id.* The substantial evidence standard authorizes this court to set aside the Commission's findings of fact only when a review of the whole record clearly indicates the agency's decision lacks a reasonably sound base of evidentiary support. *Id.*

In addition to the limited review imposed by the substantial evidence test, this court must also determine whether the Commission's decision, ruling, or order is contrary to law. *Indianapolis Water Co. v. Public Service Commission of Indiana* (1985), Ind.App., 484 N.E.2d 635, 637. Specifically, the Commission must stay within its jurisdiction and conform to the statutory and legal principles which must guide its decision, ruling, or order. *Id. Gary–Hobart Water Corp. v. Indiana Utility Regulatory Comm'n* (1992), Ind.App., 591 N.E.2d 649, 652.

I

■ First, appellants argue that the Commission erred in interpreting the statutory prerequisites for pre-approval of environmental compliance plans found in I.C. § 8–1–27–8. Specifically, appellants contend that the commission ignored the intent of the Indiana General Assembly that environmental compliance plans must satisfy the four independent criteria in I.C. § 8–1–27–8(1), and argue that because the four criteria are joined by the conjunction "and," the commission must find that each criterion has been satisfied. We agree.

As set forth above, under I.C. § 8–1–27–8(1), the Commission must find that the environmental compliance plan (A) is reasonably designed to meet or exceed the applicable requirements of the Clean Air Act Amendments of 1990; (B) constitutes a reasonable and least cost strategy over the life of the investment consistent with providing reliable, efficient, and economical electrical service; (C) is in the public interest; and (D) either uses Indiana coal or justifies its nonuse of Indiana coal by economic considerations including the effects in the regions of Indiana in which the mining of coal provides employment and in the service territory of the public utility. I.C. § 8–1–27–8(1)(A)–(D).

■ In its decision, the Commission stated that the statute "does not require four separate findings but one finding with four subparts and every part must be considered individually as well as pieces [sic] of the whole picture." Record, p. 1319. The appellants point to this statement as evidence that

the Commission misconstrued the statute as requiring a blending or balancing of the criteria.

The appellants are correct that four findings are required, but we conclude that the Commission has satisfied this requirement and that the Commission's interpretation of the statute is reasonable, even if somewhat confusing. Indeed, the grammatical structure of the statute suggests the interpretation espoused by the Commission; each of the four subparts of subsection (1) is a completion of the clause, "The commission shall issue an order approving an environmental compliance plan if the commission (1) Finds that the environmental compliance plan...." Thus, it is not inaccurate to say that the statute requires "one finding with four subparts" and that "every part must be considered individually"; it is inaccurate, however, to say that the statute "does not require four separate findings." As we find that the Commission did make the requisite individual findings, the Commission's error in describing its statutory responsibility is harmless.

With regard to I.C. § 8–1–27–8(1)(A), the Commission found that "IPL's Plan ... is designed to meet and exceed the applicable requirements of the CAAA." Record, p. 1319. With regard to I.C. § 8–1–27–8(1)(B), the Commission stated, "[W]e find, that IPL's Plan constitutes a reasonable and least cost strategy over the life of the investment consistent with providing reliable, efficient, and economical electrical service." Record, p. 1343. With regard to I.C. § 8–1–27–8(1)(C), the Commission stated, "[B]ased upon a review of the statute and the evidence in this Cause, the Commission finds that IPL's Plan is in the public interest." Record, p. 1340. With regard to I.C. § 8–1–27–8(1)(D), the Commission stated, "The parties are in agreement that IPL's Plan provides for the continued or increased use of Indiana coal and we so find." Record, p. 1338.

Accordingly, we find that the Commission satisfied the statutory requirement of separate findings on each part of I.C. § 8–1–27–8(1).

## II

■ The appellants argue next that the Commission improperly shifted the burden of proof to the intervenors when it approved IPL's proposed plan on the grounds that the intervenors had not offered a superior alternative to IPL's plan. The appellants contend that the Commission allowed IPL to file its plan and then challenged the UCC, the Intervenors, and the Commission staff to show that its plan was not worthy of pre-approval.

■ Appellants are correct that IPL, as the party petitioning for relief, bore the burden of proving compliance with the statute. *Maurer v. Indiana Dept. of Revenue* (1993), Ind.Tax, 607 N.E.2d 985, 986. Submission of a plan to the Commission was entirely voluntary on the part of IPL, and no other parties were required to respond in any way or to submit alternative plans. I.C. § 8–1–27–6(a). Appellants contend that the Commission's order shows that it approved IPL's plan because it was the best of those presented, and direct us to statements in the order in which comparisons between the IPL plan and the alternative plans were made.

Upon an examination of the record, we find no evidence to suggest that the Commission improperly allocated the burden of proof to the appellants. While the order does contain statements comparing IPL's plan to plans submitted by the intervenors, it is logical that in explaining its reasoning for approving the IPL plan, the Commission would make reference to the advantages of the IPL plan over the others. The appellants are correct to note that they were not required to submit alternative plans; having done so, however, the appellants invited the comparisons to which they now object.

Under I.C. § 8–1–27–6, an environmental compliance plan submitted by a utility must contain an analysis of the comparative estimated costs of meeting CAAA requirements "through measures proposed by the public utility and other alternative compliance measures submitted by the public utility." I.C. § 8–1–27–6(b)(5). Plans must also include a comparison of economic and employment effects on Indiana coal mining of alternative compliance measures identified under subdivision (5). I.C. § 8–1–27–6(b)(6)(A). The Commission's order demonstrates that in reaching its decision it considered the alternative compliance measures submitted by IPL as well as by the intervenors. We find no evidence that these considerations resulted in a shift in the burden of proof.

## III

The appellants each have advanced several arguments challenging the Commission's finding that the plan constitutes "a reasonable and least cost strategy" as required by I.C. § 8–1–27–8(1)(B). These arguments overlap to varying degrees, and we will address each of the arguments in turn.

■ First, the appellants argue that the Commission misinterpreted I.C. § 8–1–27–8(1)(B) by considering factors other than cost in its determination of whether to pre-approve the IPL plan. IIG argues that interests adverse to the ratepayers were weighed in assessing the "reasonable and least cost" criterion, in contravention of the legislative intent of this subsection, which IIG alleges was to protect ratepayers from "having to bear excessive costs as a result of CAAA compliance plan approval." IIG Appellants' Brief, p. 43.

We find this argument to be without merit. The full text of I.C. § 8–1–27–8(1)(B) requires the Commission to find that the plan "[c]onstitutes a reasonable and least cost strategy over the life of the investment consistent with providing reliable, efficient, and economical electrical service." Clearly, this language anticipates that a broad range of considerations will enter into the Commission's determination on this criterion. The plan need not be the least expensive, but merely "a" reasonable and least cost strategy, taking into account the system's reliability, efficiency, and economic impact. The phrase "over the life of the investment" recognizes the importance of long-term considerations in evaluating the plan. We find the Commission to be correct in its interpretation that "the statute does not require the utility's compliance plan to be demonstrated to be the 'least cost' without consideration of reasonableness under any conceivable set of circumstances." Record, p. 1342.

Second, the appellants argue that the Commission misinterpreted the criterion of I.C. § 8–1–27–8(1)(B) that the plan constitute "a reasonable and least cost strategy" by unlawfully expanding the definition of "cost" in "least cost strategy" at the expense of the traditional *quid pro quo* between IPL and its ratepayers. The appellants direct us to our opinion in *Indiana Gas Co., Inc. v. Office of Utility Consumer Counselor* (1991), Ind. App., 575 N.E.2d 1044, as follows:

"The regulation of utilities arises out of a 'bargain' struck between the utilities and the state. As a quid pro quo for being granted a monopoly in a geographical area for the provision of a particular good or service, the utility is subject to regulation by the state to ensure that it is prudently investing its revenues in order to provide the best and most efficient service possible to the consumer. At the same time, the utility is not permitted to charge rates at the level which its status as a monopolist could command in a free market."

*Id.* at 1046. The appellants assert that the statutory requirement that the plan be "a reasonable and least cost strategy" is intended to protect ratepayers against a utility developing and implementing an unreasonable or comparatively uneconomic plan and then trying to make its customers pay for it.

We agree, but we do not find that the Commission has misconstrued the term "cost" in contravention of the *quid pro quo* between the utility and its ratepayers. As discussed above, the Commission was required to take more than the bottom line into account in its determination under I.C. § 8–1–27–8(1)(B), and we agree with the Commission's statement that "[t]he word 'reasonable' modified strategy, suggesting that the utility is not wedded solely to computerized present worth of revenue requirements comparisons but may take judgmental matters into account." Record, p. 1342.

Third, the appellants argue that the Commission's finding that IPL's plan constituted a reasonable and least cost strategy was not supported by sufficient evidence. As noted above, under our standard of review we may not set aside the Commission's findings of fact unless a review of the whole record clearly indicates the agency's decision lacks a reasonably sound base of evidentiary support. *Citizens Action Coalition,* 555 N.E.2d at 165. Here, we conclude that the Commission's finding that the plan constitutes "a reasonable and least cost strategy" is adequately supported.

In its finding no. 7, the Commission sets forth its analysis of the range of options evaluated by IPL, of the feasibility of using emission allowances to reduce compliance costs, of the projected price and availability of high, medium, and low sulfur coal, of the thoroughness of IPL's evaluation of its compliance options, of the comparative merits of deferring scrubbing in favor of a strategy combining fuel switching and purchasing allowances, and of the potential utilization of a "demand-side management" program to reduce IPL's total system $SO_2$ emissions. We need not recite here the evidence supporting each facet of the Commission's analysis; the Commission's order contains ample citation to record evidence in support of its findings. We conclude that the appellants have failed to demonstrate that the Commission's decision lacks a reasonably sound base of evidentiary support.

Fourth, CAC argues that the Commission erred in finding that the plan is "a reasonable and least cost strategy" because IPL did not subject its plan to a detailed economic comparison with alternative plans. This argument attacks the IPL planning process on several grounds. First, CAC argues that IPL ignored the initially ambivalent report of its financial personnel, who had found that no clear-cut plan stood out after a preliminary evaluation of eight plans. Next, CAC argues that IPL failed to heed the initial report it commissioned from Stone & Webster Engineering Corp., which also evaluated eight plans, finding that three of them were similar in economic impact. The three plans included Plan A, which is an early version of the final plan, and Plans E and F, both of which involved an immediate switch to low sulfur fuel and a deferred installation of scrubbers. CAC notes that the report states that Plan A "is the most certain, self-reliant plan for compliance," but that Plans E and F "have an advantage over Plan A in the area of future

flexibility." Record, p. 5336. IPL then began the process of seeking pre-approval from the Commission, and requested Stone & Webster to prepare an updated report. This final report, introduced into evidence, favored the adoption of Plan A.

CAC argues that IPL management philosophy, which favored scrubbing over the purchase of allowances, skewed the process toward Plan A from the start, that IPL failed to take advantage of the flexibility provided by the CAAA in not examining many potential combinations of compliance options, and that IPL ignored the recommendations of its own financial analysts, William F. Frazier and Frederick E. Depenbrock.

■ This is patently an invitation to reweigh the evidence, which we may not accept. *Citizens Action Coalition*, 555 N.E.2d at 165.

■ Fifth, CAC makes a corollary argument concerning the Commission's finding that "the life of the affected units" should be the governing criterion in determining "the life of the investment." Record, p. 1341–42. CAC claims that the Commission's order should be reversed because the Commission either misconstrued the phrase "over the life of the investment" or erred in finding that there was adequate evidence to support a finding under I.C. § 8–1–27–8(1)(B). CAC makes this argument on the grounds that IPL did not include an evaluation of the cost of the various compliance alternatives over a sufficient number of years to cover the life of the Petersburg generating units, considering that the cost to replace the scrubbers at the end of their useful lives would affect the comparative economics of the compliance options. Specifically, CAC contends that IPL should have extended its analysis of the "cost per worth of revenue requirements" ("CPWRR")[1] of each option through the years 2028 and 2029, which CAC alleges to be the remaining life of the Petersburg units.

The record shows that the comparative analyses presented by IPL included CPWRR projections through 2021, i.e., through the anticipated 25–year life of the scrubbers, and not through the potential remaining life of the Petersburg units. However, there was no evidence to suggest that extending the CPWRR analysis further into the future would have been useful to the Commission, given the admitted unreliability of such forecasting and the fact that the actual life of a generating unit may be shorter than its estimated life, depending upon the economics of refurbishing and maintaining a unit. Moreover, the Commission was entitled to make reasonable inferences from the evidence presented, and it is reasonable for the Commission to have extrapolated beyond the CPWRR projections provided by IPL. We find the evidence sufficient to support the Commission's determination that the plan is a reasonable and least cost strategy "over the life of the investment."

■ Sixth, in a related issue, IIG argues that the Commission erred in denying a motion by CAC for an additional hearing pursuant to 170 I.A.C. 1–1–20 to present additional evidence that IPL failed to pursue a reasonable and least cost strategy. The evidence concerned an offer by Public Service Indiana Resources, Inc. ("PSI") to enter into an agreement with IPL to provide lower sulfur Indiana coal and allowances in lieu of building scrubbers; CAC contended that the PSI offer would reduce the cost of compliance by at least $100 million over a ten-year period compared to the IPL plan. CAC's motion was filed one month after the Commission had closed its hearings in the case.

Under 170 IAC 1–1–20(b), a petition for further hearing to introduce additional evidence must show, inter alia, that such evidence will not be "merely cumulative." In denying CAC's motion, the court stated:

"The PSI 'offer' appears to contain nothing more than what the other parties have presented in the Cause and merely supports those arguments that IPL's Plan to build scrubbers does not constitute the least cost strategy.... [W]e do not believe it rises to the level of further consideration nor do we believe any additional

---

1. A CPWRR analysis shows the impact of the expected cost of a compliance plan on a utility's rates over a period of years.

evidence or hearings are necessary in this Cause. This Commission needs no further evidence to assist it in making the findings required by I.C. 8–1–27–8."

Record, p. 1304.

The burden was with CAC to show that its additional evidence was not merely cumulative, and we agree with the Commission that CAC did not meet this burden. In fact, the PSI offer, which is attached to CAC's motion as Exhibit 1, states,

"[W]e believe that Commission Staff and existing Intervenors have already demonstrated the facts of this matter sufficiently to the [Commission] to make such an outcome [acceptance of the proposal] appropriate. PSI Resources' proposal to enter into a service contract is further support that your positions are well justified."

Record, p. 1118.

The Commission did not err in denying CAC's motion for an additional hearing.

## IV

■ IIG and UCC each have advanced arguments challenging the Commission's finding that the plan satisfies the "public interest" criterion at I.C. § 8–1–27–8(1)(C). IIG argues that the Commission combined the "public interest" and "Indiana coal" criteria into a single factor and made its determination on the basis of the plan's potential benefits to coal producers rather than to its ratepaying consumers. UCC argues similarly that the Commission overemphasized the economic impact of the plan on the coal, construction, and building trades industries, but neglected to require that IPL show the economic impact of its plan on its service territory. Both IIG and UCC argue, as above, that the Commission failed to balance properly the financial interests of IPL and its customers. We disagree.

■ Ind.Code § 8–1–27–8(1)(C) requires the Commission to find simply that the plan "[i]s in the public interest." Where a term is not statutorily defined, we employ the term's "plain, ordinary, and usual meaning." *Ralph L. Shirmeyer, Inc. v. Indiana Revenue Bd.* (1951), 229 Ind. 586, 591, 99 N.E.2d 847, 849. Thus, public interest may

be taken to encompass a wide range of considerations, from environmental, health, and safety concerns to the financial concerns of employers, employees, and ratepayers. As noted by the Commission:

"[O]ur General Assembly did not limit the term 'public interest' in any manner. This part of this statute should be construed consistent with the statute as a whole and the statute contemplates consideration be given to the economic effects upon employment in regions where the mining of coal provides employment and in the utility's service territory.

\*  \*  \*  \*  \*  \*

We are certainly aware that the ratepayer interest is inherent in the public interest. We are not unmindful of the impact of compliance on rates. Although alternative short term measures would defer the impact on rates, substantial evidence indicates that over the long term, such measures will not be less costly and will likely be more costly than IPL's plan. In this light it would be a disservice to the public to adopt a short term solution."

Record, p. 1339–40. The Commission's order demonstrates that the Commission did indeed balance the financial interests of the ratepayers with other factors equally important in the public interest, of which the plan's impact on employment in the coal and construction industries is a relevant aspect. An examination of the record shows that there was sufficient evidence to support the Commission's finding that the plan was in the public interest.

## V

■ We consider next the UCC's argument that the Commission erred in failing to determine the manner and timing of the applicable regulatory treatment of emission credits.

Under I.C. § 8–1–27–14, if the plan approved by the Commission exceeds the applicable requirements of the CAAA by means of early or over compliance, as the IPL plan does,

"the commission shall, in the order approving the plan, determine the manner and

timing of the applicable ratemaking and regulatory treatment of any emission credits or other additional benefits expected to result from the early or over compliance." I.C. § 8–1–27–14. The UCC argues that "[w]hile the Commission perfunctorily acknowledges an accounting treatment of these credits, IPL is not told what to do with them to achieve a least cost outcome." Appellant UCC's brief at 46. UCC asserts that the Commission's failure to hold IPL accountable is reversible error. We disagree.

In its finding no. 16, the Commission analyzed IPL's plans for the emission allowances expected to result from its use of scrubbers. The Commission's recognition that allowance prices are necessarily uncertain, being subject to market forces, is not a deferral to IPL management, as UCC contends, but a realistic assessment: "We believe that in enacting I.C. 8–1–27, the General Assembly was well aware that there are no guarantees about the future." Record, p. 1350.

The Commission did not err in finding that "IPL's proposal is equitable in that all of the benefits of allowance sales flow to customers irrespective of their ultimate value." Record, p. 1351.

## VI

■ We address finally the constitutional issues raised by IIG. IIG challenges the "Indiana coal" provisions of I.C. § 8–1–27–1 et seq. on the grounds that they impose an unconstitutional burden on interstate commerce in violation of the Commerce Clause of the United States Constitution.[2] Our determination of this issue is aided by the recent decision of Judge Tinder of the United States District Court for the Southern District of Indiana in the case of Alliance for Clean Coal v. Bayh (1995), S.D.Ind., 888 F.Supp. 924. Judge Tinder found the very provisions at issue before us to be facially unconstitutional under the Commerce Clause.[3]

■ Although "the federal judiciary is supreme in the exposition of the law of the Constitution," Cooper v. Aaron (1958), 358 U.S. 1, 18, 78 S.Ct. 1401, 1409, 3 L.Ed.2d 5, 19, we are not bound by Judge Tinder's determination.

" 'Where a question is federal in its nature, the decisions of the supreme court of the United States are absolutely binding on the various state courts and must be followed.' 21 C.J.S., Courts, p. 365, § 206; 15 C.J., p. 930, § 318. While there is a conflict as to whether the decisions of the lower federal courts are binding on state courts, the weight of authority is, that while such decisions have a persuasive authority, they are not binding on the state courts."

Pennsylvania R. Co. v. F.E. Mathias Lumber Co. (1943), Ind.App., 47 N.E.2d 158, 159. Because we agree with Judge Tinder's reasoning, we adopt those portions of his decision relevant to the issues we have in common and address separately those issues raised before us exclusively.

As explained below, the effect of Judge Tinder's decision is to invalidate only those sections of the Act deemed unconstitutionally protective of the Indiana coal industry. Under Indiana's severability statute, I.C. § 1–1–1–8, because the offending provisions of the Act may be deleted without destroying the

---

**2.** IPL has argued that the Appellants have waived their right to bring their constitutional challenge before us because they failed to raise constitutional issues before the Commission. We disagree. In I.C. § 8–1–3–1, the legislature afforded all ratepayers, whether participants in the Commission proceeding or not, the right to raise new issues challenging a Commission decision subsequent to the proceeding. Citizens Action Coalition v. PSI (1991), Ind., 582 N.E.2d 330, 334. IPL cites National Rural Utilities Co-op v. PSC (1990), Ind., 552 N.E.2d 23, for the proposition that constitutional issues must first be presented to the Commission. Appellee's Brief at 67. That case is distinguishable in that the appellants there were challenging a Commission

order on the grounds that it was an unconstitutional taking under the Fifth Amendment; in the present case, the constitutional challenge is to the statute underlying the Commission order, not to the order itself. The Commission is without jurisdiction to adjudicate such a challenge.

**3.** We note that Judge Tinder's decision follows on the heels of the decision of the United States Court of Appeals for the Seventh Circuit in Alliance for Clean Coal v. Miller (1995), 7th Cir., 44 F.3d 591, striking down provisions of the 1991 Illinois Coal Act (enacted in response to the CAAA; see 220 ILCS 5/8–402.1) on Commerce Clause grounds.

purpose of the Act, we must reverse the Commission's decision and remand this case to the Commission for a redetermination of the IPL proposal.

The appellants in *Alliance for Clean Coal* challenged three of the six provisions of the Act challenged by IIG. Indiana Code § 8–1–27–6(b)(6)(A) provides that if the utility proposes a change in fuel type which would result in diminished use of Indiana coal, the utility must submit an analysis of the economic and employment effects of the change on coal mining regions in Indiana and on the preservation of the mining of Indiana coal as a viable source of fuel. Indiana Code § 8–1–27–8(1)(D) provides that before the Commission can approve the plan, it must find that the plan either provides for continued or increased use of Indiana coal or that the plan is justified by economic considerations, including the effects on Indiana coal mining regions. Indiana Code § 8–1–27–20 provides for annual reviews of compliance plans which result in the diminished use of Indiana coal. The other three provisions challenged by IIG are I.C. §§ 8–1–27–4, 8–1–27–5.5, and 8–1–2–6.6(b), which we address below.

Judge Tinder's analysis of the constitutionality of the "Indiana coal" provisions is straightforward.

"Analysis of the statute in question begins with the presumption that such statute is presumed to be constitutional. *Bowen v. Kendrick,* 487 U.S. 589, 617, 108 S.Ct. 2562, 101 L.Ed.2d 520 (1988) (reviewing federal statute); *Hines v. Elkhart Gen. Hosp.,* 465 F.Supp. 421 (N.D.Ind.), *aff'd,* 603 F.2d 646 (7th Cir.1979). *Cf. Eddy v. McGinnis,* 523 N.E.2d 737 (Ind.1988) (every enactment by the state legislature that is challenged before the Indiana Supreme Court is presumed to be constitutional). It is clear that the interstate sale of coal is commerce; thus, any statute or regulation affecting this commerce must pass constitutional muster under the federal Commerce Clause. U.S. Const. art. 1, § 8, cl. 3.

The Commerce Clause of the United States Constitution grants Congress the power '[t]o regulate Commerce ... among the several States.' U.S. Const. art. 1, § 8, cl. 3. While the clause is silent as to how much power a state retains to regulate economic activities within its borders, for more than one hundred year[s] the United States Supreme Court has held that the Commerce Clause also includes a prohibition on states from taking certain actions even absent congressional action. [citations omitted] In the context of a Commerce Clause case, Justice Cardozo observed that the Constitution 'was framed upon the theory that the peoples of the several states must sink or swim together, and that in the long run prosperity and salvation are in union and not division.' *Baldwin v. G.A.F. Seelig, Inc.,* 294 U.S. 511, 523, 55 S.Ct. 497, 500, 79 L.Ed. 1032 (1935). Thus, the clause has been applied to assure that no state can thwart the ideal that the basic economic unit is the nation and that 'the future of our Nation depends not on how certain parts of it fare but on how it does as a whole.' *Dutchess Sanitation Serv. Inc. v. Town of Plattekill,* 51 N.Y.2d 670, 435 N.Y.S.2d 962, 417 N.E.2d 74, 76 (N.Y.1980). Indeed, Indiana businesses have benefitted from this use of the dormant Commerce Clause. *New Energy Co. v. Limbach,* 486 U.S. 269, 108 S.Ct. 1803, 100 L.Ed.2d 302 (1988) (Court strikes down an Ohio tax credit law that exempted from taxation the sale of Ohio-produced ethanol on grounds that the law discouraged the sale of Indiana-produced ethanol in Ohio).

A state statute may violate the Commerce Clause either by discriminating against out-of-state economic interests or by benefitting in-state interests. *See Bacchus Imports, Ltd. v. Dias,* 468 U.S. 263, 273, 104 S.Ct. 3049, 3056, 82 L.Ed.2d 200 (1984) ('[I]t is irrelevant to the Commerce Clause inquiry that the motivation of the legislature was the desire to aid [in-state interests] rather than to harm out-of-state producers.'); *Limbach,* 486 U.S. at 273–74, 108 S.Ct. at 1807–08. Thus, the court must determine whether the challenged portions of the [Act] are just 'protectionist measure[s], of whether [the Act] can fairly be viewed as a law directed to legitimate local concerns, with effects upon interstate commerce that are only incidental.' *City*

*of Philadelphia v. New Jersey,* 437 U.S. 617, 624, 98 S.Ct. 2531, 2536, 57 L.Ed.2d 475 (1978).

A statute may violate the Commerce Clause even without demonstrable economic effects. The Supreme Court has held that 'where discrimination is patent ... neither a widespread advantage to in-state interests nor a widespread disadvantage to out-of-state competitors need be shown.' *Limbach,* 486 U.S. at 276, 108 S.Ct. at 1809. If a statute clearly is designed to burden interstate commerce, it is repugnant to the Commerce Clause regardless of the amount of commerce actually affected. *See Bacchus Imports,* 468 U.S. at 269, 104 S.Ct. at 3054.

This limitation on state regulatory power, however, is not absolute. The states retain authority under their general police powers to regulate matters of legitimate local concern even though interstate commerce is affected. *Lewis,* 447 U.S. at 36, 100 S.Ct. at 2015–16; *Maine v. Taylor,* 477 U.S. 131, 138, 106 S.Ct. 2440, 2447, 91 L.Ed.2d 110 (1986). When such a state regulation is challenged as a violation of the dormant Commerce Clause, it will be subjected to one or two tests, depending upon the discriminatory nature of the statute. The first test applies if a statute is discriminatory on its face or in practical effect. The state bears the burden of justifying the discrimination by showing the following: (1) the statute has a legitimate local purpose; (2) the statute serves this interest; and (3) nondiscriminatory alternatives, adequate to preserve the legitimate local purpose, are not available. *See Hughes v. Oklahoma* [ (1979) ], 441 U.S. [322,] 336, 99 S.Ct. [1727,] 1736–37[, 60 L.Ed.2d 250 (1979) ]; *Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 353, 97 S.Ct. 2434, 2446–47, 53 L.Ed.2d 383 (1977); *Dean Milk Co. v. City of Madison,* 340 U.S. 349, 354, 71 S.Ct. 295, 297–98, 95 L.Ed. 329 (1951). 'If a restriction on commerce is discriminatory, it is virtually per se invalid.' *Oregon Waste Sys.[, Inc. v. Department of Envtl. Quality,* — U.S. —] at —, 114 S.Ct. [1345] at 1350 [128 L.Ed.2d 13 (1994) ]. The Supreme Court stated the second

commerce clause test in *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970): '[w]here the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits.' *Id.* at 142, 90 S.Ct. at 847.

The [Act] clearly imposes a facial and patent burden on interstate commerce. It is plainly protectionist to the extent that it requires the [Act] to consider the effects a utility's 1990 CAAA compliance plan may have on the Indiana coal industry and imposes restrictions on approval of the plan based upon the plan's effects on the Indiana coal industry. The [Act] cannot be justified on the grounds that it protects the state of Indiana and its citizens from economic harm which could result from a decline in the state's coal industry as a consequence of compliance with the 1990 CAAA. 'Preservation of local industry by protecting it from the rigors of interstate competition is the hallmark of economic protectionism that the Commerce Clause prohibits.' *West Lynn Creamery, Inc. v. Healy,* — U.S. —, —, 114 S.Ct. 2205, 2217, 129 L.Ed.2d 157 (1994). The obvious intent of the challenged portions of the [Act] was to limit or eliminate the use of western coal in Indiana generating plants with an eye toward promoting instead the use of high sulfur coal, preferably that mined in Indiana. This is exactly the type of statute the dormant Commerce Clause prohibits. *See, e.g., Miller,* 44 F.3d at 596–97. Therefore, the challenged portions of the [Act] fail to pass constitutional muster because they fail to promote any 'legitimate' local interest."

*Alliance for Clean Coal,* 888 F.Supp. at 933–935 (footnotes omitted).

As in the present case, the appellees in *Alliance for Clean Coal* argued that the voluntary nature of the Act ameliorated any possible violative effect on interstate commerce. *Id.* at 935. Calling this argument "specious," Judge Tinder stated,

"The only way for the utility to ensure it will receive the necessary rate increases to

finance its 1990 CAAA compliance plan is to avail itself of the procedures provided by the [Act]. Accordingly, the utility will be faced with the barely veiled choice of installing new scrubbers and using local coal or traversing the uphill slope of seeking approval to use western coal which would require the utility to demonstrate that the cost savings offsets the damage done to the Indiana coal industry. It is plain that the [Act] is 'voluntary' in word alone."

*Id.* at 936.

In its amicus brief, the State of Indiana articulates a number of policy arguments on behalf of the constitutionality of the statute. Despite an heroic effort, however, the State cannot escape the reality that the statute, as worded, is patently protectionist. First, the State argues that the phrase "Indiana coal" does not mean coal from the State of Indiana, but is rather a "shorthand expression for the cheapest coal." State's Amicus Curiae Brief, pp. 17–18, nn. 33, 34. While Indiana coal may indeed be the cheapest coal, the State's argument ignores the plain language of the statute, particularly the definition of "Indiana coal" at I.C. § 8–1–27–4.[4] Second, the State seeks to minimize the protectionist language and effects of the statute by linking its language to the policy goals of the CAAA, which included the goal of lessening the economic impact of the acid rain emission reduction program on midwestern states by encouraging the use of high sulfur coal and scrubbers. This argument fails to recognize that while it may be constitutional for Congress to seek to minimize the deleterious effects of environmental legislation on a particular industry, such a federal policy does not grant individual states the right to discriminate legislatively in favor of in-state industry. In a related argument, the State contends that by fulfilling the federal policy of supporting the high sulfur coal industry, the effect of the "Indiana coal" provisions is to aid the high sulfur coal industry in other states. Again, a side-effect of the protectionist provisions beneficial to some out-of-state interests does not ameliorate their unconstitutionality.

Third, the State argues that the challenged provisions are only activated when a change of fuel type is proposed. This is true of I.C. § 8–1–27–6(6), but it is simply untrue of I.C. § 8–1–27–8(1)(D), which requires of all proposed plans a finding that the plan either provides for continued or increased use of Indiana coal or demonstrates a justification of such nonprovision. Indeed, plans that do not provide for continued or increased use of Indiana coal may be rejected on that basis alone.

With regard to the other three provisions challenged by IIG, we note that IIG has presented no argument concerning I.C. § 8–1–27–4, which defines "Indiana coal," and I.C. § 8–1–27–5.5, which defines "change in fuel type," and thus we have no basis upon which to determine the constitutionality of these provisions. IIG did argue the unconstitutionality of I.C. § 8–1–2–6.6, however, and we agree that this provision is an unconstitutional interference with interstate commerce under the same principles upon which Judge Tinder based his decision.

Indiana Code 8–1–2–6.6 allows the Commission to add the value of any "qualified pollution control property" (i.e., any air pollution control device, such as a scrubber, on a coal burning electric generating facility) to the value of the utility's property for rate-making purposes, but only if the facility uses Indiana coal as a primary fuel source or if the utility can prove that it is justified by economic considerations or government requirements in using some non-Indiana coal. I.C. § 8–1–2–6.6(b). This provision echoes the language of I.C. §§ 8–1–27–6 and 8–1–27–8 which the court found offensive, and, like those provisions, it is patently protectionist. As Judge Tinder wrote, "The [Act] cannot be justified on the grounds that it protects the State of Indiana and its citizens from economic harm which could result from a decline in the state's coal industry as a consequence of compliance with the 1990 CAAA." *Alliance for Clean Coal,* 888 F.Supp. at 935. Thus, we declare that the

---

4. " 'Indiana coal' means coal from a mine whose coal deposits are located in the ground wholly or partially in Indiana regardless of the location of the mine's tipple." I.C. § 8–1–27–4.

portions of I.C. § 8–1–2–6.6 relating to Indiana coal are unconstitutional and must be severed.[5]

 Finally, we must devote our attention to the effect on the present case of severing the offending provisions from the Act. As noted by Judge Tinder:

> "The challenged provisions of the [Act] are merely one factor included in the criteria governing the submission of compliance plans to the [Commission], the review of compliance plans by the [Commission] and the subsequent annual review of compliance plans.... The challenged provisions could, therefore, be removed from the [Act] without destroying the essential purpose of the statute. Overall, the [Act] is not so essentially connected with and dependent upon the specific provisions challenged herein that it cannot be presumed that the legislature would [not] have enacted the remainder without the invalid provisions."

*Id.* at 937–38. Judge Tinder goes on to state that only one of the four factors enumerated in I.C. § 8–1–27–8(1) concerns the effect of the plan on the Indiana coal industry, and that even if that factor were removed, the mechanism for reviewing compliance plans would remain intact. *Id.* at 937–38. We agree. We note, however, that if the IPL plan is found by the Commission to be the option best fitting the non-protectionist criteria in the statute, no bar exists to its approval on the basis that it includes the use of Indiana coal and scrubbers.

Accordingly, in addition to the sections declared unconstitutional by Judge Tinder— I.C. §§ 8–1–27–6(b)(6), 8–1–27–8(1)(D), and 8–1–27–20—we find the above-noted sections of I.C. § 8–1–2–6.6 unconstitutional. The Commission's order is therefore reversed and remanded for reconsideration in accordance with this opinion.

REVERSED and REMANDED.

DARDEN and CHEZEM, JJ., concur.

---

5. The severable sections are: (1) in I.C. § 8–1–2–6.6(a), the definition of "Indiana Coal" and the last clause in the definition of "Qualified pollution control property" ("and that is designed to accommodate the burning of coal from the geological formation known as the Illinois Basin"); (2) in I.C. § 8–1–2–6.6(b), the following: "but only if at the time of the application and thereafter: (1) The facility burns only Indiana coal as its primary fuel source once the air pollution control device is fully operational; or (2) The utility can prove to the commission that the utility is justified because of economic considerations or governmental requirements in utilizing some non-Indiana coal."