ALLIANCE FOR CLEAN COAL, a
Virginia not-for-profit corporation,
Plaintiff–Appellee,

v.

Honorable Evan BAYH, in his official ca-
pacity as Governor of the State of
Indiana, John F. Mortell, Frederick L.
Corban, Mary Jo Huffman, G. Richard
Klein and David E. Zeigner, in their
official capacities as, respectively,
Chairman and Commissioners of the
Indiana Utility Regulatory Commission,
Defendants–Appellants,

and

PSI Energy, Incorporated, and United
Mine Workers of America, Inter-
venor/Defendants–Appellees.

No. 95–2065.

United States Court of Appeals,
Seventh Circuit.

Argued Oct. 23, 1995.

Decided Dec. 22, 1995.

R.R. McMahan (argued), Gerald O. Sweeney, Jr., Damon N. Vocke, Lord, Bissell & Brook, Chicago, IL, Robert W. Geddes, Hume, Smith, Geddes & Green, Indianapolis, IN, for plaintiff-appellee.

G. Daniel Kelley (argued), Edward P. Steegmann, Ice, Miller, Donadio & Ryan, Myra P. Spicker, Office of the Attorney General, Indianapolis, IN, for defendants-appellants.

Peggy A. Hillman, Indianapolis, IN, Edgar N. James, Washington, DC, for intervenor-defendant.

Virgil L. Beeler, Fred E. Schlegel, Baker & Daniels, Indianapolis, IN, for intervenor-appellee.

Before CUMMINGS, RIPPLE and MANION, Circuit Judges.

CUMMINGS, Circuit Judge.

Plaintiff Alliance for Clean Coal ("Alliance") is a trade association whose members market and transport coal produced from western United States mines. Alliance sued the governor of Indiana and members of the Indiana Utility Regulatory Commission ("Commission") challenging portions of the Indiana Environmental Compliance Plans Act ("ECPA") (IC 8–1–27–6(b)(6), 8–1–27–8(1)(D) and 8–1–27–20) (Appendix, *infra* ).[1] The challenged sections of the ECPA are virtually identical to those sections of the Illinois Coal Act that we recently held were unconstitutional in *Alliance for Clean Coal v. Miller,* 44 F.3d 591 (7th Cir.1995). For the reasons more fully discussed below, we hold that the ECPA discriminates against interstate commerce just as did the Illinois Coal Act and thus violates the Commerce Clause of the United States Constitution.

### Background

Coal remains a vital source of fuel for this country's electrical utilities. As of 1992, 409 of the 998 million tons of coal produced in the United States were produced in 17 states west of the Mississippi River. Energy Information Administration, *Coal Production 1992* (Oct. 1993). Almost all of the coal produced in these western states is sold and shipped to utilities for electricity generation. Alliance members market and transport coal produced from Wyoming, Colorado, Montana and Utah mines ("western coal") and represent the major participants in interstate commerce in western coal.

Because of the sulfur contained in the coal they burn, coal-fired generating plants are a principal source of atmospheric sulfur dioxide emissions. The sulfur content of coal burned by utilities depends upon the geological origin of the coal: whereas coal mined in the western United States has the lowest sulfur content, almost all of the coal mined in the "Illinois Basin," including most of Illinois and parts of Indiana and western Kentucky, has a relatively high sulfur content.

Congressional enactment of the Clean Air Act Amendments of 1970 required newly constructed generating units to use systems of emissions control approved by the Environmental Protection Agency ("EPA"). The EPA initially provided two methods for controlling sulphur dioxide emissions: (1) the use of low-sulfur coal; and (2) the installation of a device to scrub high-sulfur coal emissions before they reach the atmosphere. Because scrubbing was costlier than using low-sulfur western coal, states producing high-sulfur coal suffered competitively.

---

1. Originally Alliance attacked the entire ECPA (App. 54) but later limited its attack to certain portions of the statute (App. 8).

In 1990 the Clean Air Act was amended again to require drastic reductions in industrial sulfur dioxide emissions by the year 2000. 42 U.S.C. §§ 7401–7671q. The 1990 Act implemented an innovative market-driven approach to emissions regulation, allowing for the free transfer of emissions "allowances." The Act is aimed at reducing emissions efficiently and allows utilities to meet the standards in the cheapest manner possible. To comply with the new emissions limitations, utilities now have a choice of the following strategies: (1) installing pollution control devices; (2) using low-sulfur coal; (3) purchasing allowances to emit sulfur dioxide; (4) switching to another fuel; (5) closing down certain units; (6) offsetting emissions at one plant by over-complying at another; or (7) adopting some combination. According to Alliance, because of the high costs associated with installing pollution devices, the 1990 amendments should result in a decline in demand for the Illinois Basin's high-sulfur coal.

High-sulfur coal-mining states like Indiana considered legislation responsive to the foregoing federal acts. Thus in 1991 Indiana adopted its ECPA. IC §§ 8–1–27–1 to 8–1–27–23. This statute permits electric utilities to avail themselves of early prudency review by submitting plans for complying with the federal legislation to the Commission. In order to approve a utility's plan, the Commission must find that the plan (A) meets the Clean Air Act Amendments of 1990; (B) constitutes a reasonable and least cost strategy over the life of the investment consistent with providing reliable, efficient, and economical electrical service; (C) is in the public interest; and (D) either:

(i) provides for continued or increased use of Indiana coal in the coal-consuming electric generating units owned or operated by the public utility and affected by the Clean Air Act Amendments of 1990; or

(ii) if the plan does not provide for continued or increased use of Indiana coal, such nonprovision is justified by economic considerations including the effects in the regions of Indiana in which the mining of

coal provides employment and in the service territory of the public utility. IC § 8–1–27–8(1).

A plan that has a negative impact on Indiana coal is subject to continuing annual surveillance. IC § 8–1–27–20 ("The commission shall annually review each environmental compliance plan, the implementation of which has resulted in the displacement or diminished use of Indiana coal and determine whether a different compliance measure would more fully satisfy the requirements of section 8 of this chapter."). Those utilities whose plans are approved can include in their rate bases the cost of capital projects constructed under the plan and can recover approved costs so incurred. IC § 8–1–27–12 & 19.

In the court below Alliance moved for summary judgment on the ground that the ECPA unjustifiably discriminated against interstate commerce. The district court concluded that the ECPA was intended to promote high-sulfur coal at the expense of western coal and unconstitutionally burdens interstate commerce.[2]

As Judge Tinder explained (App. 24, 25):

The ECPA clearly imposes a facial and patent burden on interstate commerce. It is plainly protectionist to the extent that it requires the [Commission] to consider the effects a utility's 1990 CAAA compliance plan may have on the Indiana coal industry and imposes restrictions on approval of the plan based upon the plan's effects on the Indiana coal industry.

\* \* \* \* \* \*

The obvious intent of the challenged portions of the ECPA was to limit or eliminate the use of western coal in Indiana generating plants with an eye toward promoting instead the use of high sulfur coal, preferably that mined in Indiana. This is exactly the type of statute the dormant Commerce Clause prohibits.

As a result, certain provisions of the ECPA were held to be unconstitutional in a well-reasoned 30–page opinion of the district court issued on March 27, 1995 (App. 4–33).

**2.** Intervenor PSI Energy, Inc. sided with plaintiff whereas intervenor United Mine Workers of America agreed with defendants. The former has filed a brief urging affirmance.

A few months after the district court decided this case, the Court of Appeals of Indiana reached the same conclusion in *General Motors v. Indianapolis Power & Light,* 654 N.E.2d 752 (Ind.App.1995).[3] There the court approved Judge Tinder's reasoning that Indiana could not escape the reality that the statute is patently protectionist. *Id.* at 764–766. It stated that individual states are not granted "the right to discriminate legislatively in favor of in-state industry." *Id.* It further rejected the argument that the phrase "Indiana coal" in the statute does not truly mean coal from the state of Indiana because the plain language of the statute itself provides that Indiana coal "means coal from a mine whose coal deposits are located in the ground fully or partially in Indiana, regardless of the location of the mine's tipple." *Id.* at 766 n. 4. The court further concluded that a fault of the challenged provisions is that "plans that do not provide for continued or increased use of Indiana coal may be rejected on that basis alone." *Id.* at 766.

## Discussion

▆▆ The United States Supreme Court has repeatedly held that "[a]lthough the Commerce Clause is phrased merely as a grant of authority to Congress to 'regulate Commerce ... among the several States,' Art. I, § 8, cl. 3, it is well established that the Clause also embodies a negative command forbidding the States to discriminate against interstate trade." *Associated Industries of Missouri v. Lohman,* — U.S. —, —, 114 S.Ct. 1815, 1820, 128 L.Ed.2d 639 (1994). "When a state statute clearly discriminates against interstate commerce, it will be struck down ... unless the discrimination is demonstrably justified by a valid factor unrelated to economic protectionism." *Wyoming v. Oklahoma,* 502 U.S. 437, 454, 112 S.Ct. 789, 800, 117 L.Ed.2d 1 (1992). The threshold inquiry we must make in deciding whether the ECPA violates the Commerce Clause is whether it "is basically a protectionist measure, or if it can fairly be viewed as a law directed to legitimate local concerns with ef-

fects upon interstate commerce that are only incidental." *Oregon Waste Systems, Inc. v. Dept. of Environmental Quality,* — U.S. —, —, 114 S.Ct. 1345, 1350, 128 L.Ed.2d 13 (1994).

As the district judge recognized, the outcome of this case is controlled by *Alliance for Clean Coal v. Miller,* 44 F.3d 591 (7th Cir. 1995) (App. 10–12). There we invalidated the Illinois Coal Act, also enacted on the heels of the Clean Air Act Amendments of 1990, on the ground that it was repugnant to the Commerce Clause of the United States Constitution. The Illinois Coal Act provided that in preparing and approving compliance plans, the Illinois Commerce Commission and utilities were required to "take into account ... the need to maintain and preserve as a valuable State resource the mining of coal in Illinois." *Id.* at 593–594. The Act also encouraged implementing scrubbers to allow the continued use of high-sulfur coal by guaranteeing utilities the ability to recover the installation costs of scrubbers by including such costs in their rate base. *Id.* We stated "[t]he Illinois Coal Act is a none-too-subtle attempt to prevent Illinois electric utilities from switching to low-sulphur western coal as a Clean Air Act compliance option." *Id.* at 595. Therefore, we concluded that the Act was "repugnant to the Commerce Clause and the principle of a unitary national economy which that clause was intended to establish." *Id.*

The ECPA contains provisions that are virtually identical to the sections of the Illinois Coal Act discussed above. First, in determining whether to approve a plan that includes a compliance option calling for a decrease in the use of Indiana coal, the ECPA requires the Commission to take into account "the effects in the regions of Indiana in which the mining of coal provides employment and in the service territory of the public utility." IC § 8–1–27–8(1). The ECPA also provides incentives for utilities to install scrubbers to continue to use high-sulfur fuel by guaranteeing a recoupment of the implementation costs. IC § 8–1–27–12 & 19.

---

**3.** In addition to the three sections of the ECPA declared unconstitutional by Judge Tinder, the Indiana Court of Appeals found three additional sections to be unconstitutional, but they are not before us.

We agree with the district court that, just as in *Miller,* the ECPA discriminates against interstate commerce based solely upon geographic origin, and thus violates the Commerce Clause. The clear intent of the statute is to benefit Indiana coal at the expense of western coal. The fact that the ECPA does not explicitly forbid the use of out-of-state coal or require the use of Indiana coal, but "merely encourages" utilities to use high-sulfur coal by providing economic incentives does not make the ECPA any less discriminatory. As we stated in *Miller,*

> The Illinois Coal Act cannot continue to exist merely because it does not facially compel the use of Illinois coal or forbid the use of out-of-state coal. As recognized in *West Lynn Creamery,* even ingenious discrimination is forbidden by the Commerce Clause. —— U.S. at ——, 114 S.Ct. at 2215. By "encouraging" the use of Illinois coal, the Act discriminates against western coal by making it a less viable compliance option for Illinois generating plants. *Miller,* 44 F.3d at 596.

The defendants attempt to distinguish the ECPA from the Illinois Coal Act by noting that the approval process provided under the ECPA is voluntary. They note that a utility is not required to obtain the prior approval allowed by the statute. Instead, a utility ostensibly can implement its compliance plan and seek approval at a later date for any increased rates that the plan requires. We agree with the district court that this argument is "particularly specious." As Judge Tinder correctly stated (App. 26),

> The problem with this system is obvious. A corporate officer charged with fiduciary duties toward the company would be virtually required to seek pre-approval of the utility's compliance plan. Failure to do so could result in the utility entering into a contract for the purchase of ... western coal for which the [Commission] may refuse to provide a rate increase. The only way for the utility to ensure it will receive the necessary rate increases to finance its 1990 CAAA compliance plan is to avail itself of the procedures provided by the ECPA.... It is plain that the ECPA is "voluntary" in word alone.

■■■ Because the ECPA discriminates against interstate commerce, the burden lies with the defendants to prove that this discrimination is justified by a legitimate and compelling governmental interest. *Wyoming,* 502 U.S. at 456, 112 S.Ct. at 801. Defendants provide the following justification. They argue that a viable competitive Midwest high-sulfur coal market is a major component of low-cost electrical service by Indiana utilities and that the ECPA seeks only to ensure that market. [Def. Br. 12 ("The ECPA challenged provisions merely encourage the highly competitive interstate high sulphur coal market for the benefit of utilities/ratepayers and limit no benefit thereof to Indiana high sulphur coal producers.") ]. However, ensuring such a regional market is not a proper justification for discriminating against interstate commerce. As the Supreme Court stated in *West Lynn Creamery, Inc.:*

> [R]espondent urges that "the purpose of the order, to save an industry from collapse, is not protectionist." ... If we were to accept these arguments, we would make a virtue of the vice that the rule against discrimination condemns. Preservation of local industry by protecting it from the rigors of interstate competition is the hallmark of the economic protectionism that the Commerce Clause prohibits. *West Lynn Creamery, Inc. v. Healy,* [—— U.S. ——, ——,] 114 S.Ct. 2205, 2217 [129 L.Ed.2d 157].

While we do not doubt that a healthy Indiana mining industry and a fully employed workforce may aid Indiana in achieving a low cost electrical service, that is not a legitimate justification for discrimination against interstate commerce. Protection of local, or even regional, industry is simply not a legislative action that is consistent with the Commerce Clause.

### Conclusion

Despite the fact that low-sulfur western coal may be a more efficient compliance option, the ECPA clearly attempts to prevent Indiana electrical utilities from switching to low-sulfur coal. This amounts to discriminatory state action that is forbidden by the

Commerce Clause. See *Miller*, 44 F.3d at 596. The defendants have not discharged their burden of demonstrating that the statute serves a legitimate and compelling interest unrelated to economic protectionism. *Wyoming*, 502 U.S. at 454, 112 S.Ct. at 800. Judgment affirmed.

## APPENDIX

The district court declared the following provisions of the Indiana Environmental Compliance Plans Act to be violative of the United States Constitution:

**8–1–27–6. Voluntary submission of environmental compliance plan—Items required.—**

(b) An environmental compliance plan described in subsection (a) must include any information that the commission may reasonably require. The commission shall require a plan described in subsection (a) to include at least the following information:

  *  *  *  *  *  *

(6) For all compliance plans submitted to the commission after July 1, 1993, if an environmental compliance plan proposes a change of fuel type from the fuel type consumed in the public utility's generating units and that change of fuel type would result in the displacement or diminished use of Indiana coal from the quantity of Indiana coal consumed by the public utility during the calendar year 1990, or an average of the quantity of Indiana coal consumed by the utility in calendar years 1990, 1991, and 1992, whichever is submitted by the utility in the plan, the public utility shall submit the following as part of the environmental compliance plan:

 (A) An analysis of the following:

  (i) The economic and employment effects of the proposed change of fuel type on the regions of Indiana in which the mining of coal provides employment, and on the service territory of the public utility.

  (ii) The effects of the proposed modification on the preservation of the mining of Indiana coal as a viable source of fuel.

The analyses required under this clause must include a comparison of the effects likely to result from the alternative compliance measures identified under subdivision (5).

(B) Information describing the availability, the reliability, the current costs, and the projected future costs of the fuel type proposed for use in connection with the environmental compliance plan.

**8–1–27–8. Requirements for approval of plan.—**The commission shall issue an order approving an environmental compliance plan if the commission:

(1) Finds that the environmental compliance plan:

  *  *  *  *  *  *

 (D) Either:

  (i) Provides for continued or increased use of Indiana coal in the coal-consuming electric generating units owned or operated by the public utility and affected by the Clean Air Act Amendments of 1990; or

  (ii) If the plan does not provide for continued or increased use of Indiana coal, such nonprovision is justified by economic considerations including the effects in the regions of Indiana in which the mining of coal provides employment and in the service territory of the public utility;

**8–1–27–20. Annual review.—**The commission shall annually review each environmental compliance plan, the implementation of which has resulted in the displacement or diminished use of Indiana coal and determine whether a different compliance measure would more fully satisfy the requirements of section 8 [IC 8–1–27–8] of this chapter.